[No. G034590. Fourth Dist., Div. Three. Feb. 23, 2006.]

JOSHUA BARDIN et al., Plaintiffs and Appellants, v.
DAIMLERCHRYSLER CORPORATION, Defendant and Respondent.

1256

1258

COUNSEL

Greco Traficante & Edwards, Clyde C. Greco, Jr., Jon S. Brick; Gerard, Osuch & Cisneros, Robert B. Gerard; Miller Faucher and Cafferty, Marvin A. Miller, Nyran Rose Pearson and William R. Kane for Plaintiffs and Appellants.

Bryan Cave, Kathy A. Wisniewski, John W. Rogers; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., and Gregory D. Brown for Defendant and Respondent.

Robinson, Calcagnie & Robinson and Sharon J. Arkin for Consumer Attorneys of California as Amicus Curiae, upon the request of the Court of Appeal.

Bill Lockyer, Attorney General, Albert N. Shelden, Assistant Attorney General, and Ronald A. Reiter, Deputy Attorney General, as Amici Curiae.

OPINION

FYBEL, J.—

### INTRODUCTION

The trial court sustained defendant DaimlerChrysler Corporation's (DCC) demurrer to plaintiffs' second amended complaint which alleged violations of the unfair competition law (UCL)[1] and the Consumer Legal Remedies Act (CLRA),[2] and sought declaratory relief. The alleged statutory violations were based on DCC's use of tubular steel in the exhaust manifolds of certain of its vehicles instead of more durable and more expensive cast iron. We affirm because plaintiffs failed to state a claim under any of those causes of action.

There are two lines of appellate opinions addressing the definition of "unfair" within the meaning of the UCL in consumer actions. One line defines "unfair" as prohibiting conduct that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim. (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718–719 [113 Cal.Rptr.2d 399] (*Smith*); *Pastoria v. Nationwide Ins.* (2003) 112 Cal.App.4th 1490, 1498 [6 Cal.Rptr.3d 148].) The other line of cases holds that the public policy which is a predicate to a

---

[1] Business and Professions Code section 17200 et seq.

[2] Civil Code section 1750 et seq.

consumer unfair competition action under the "unfair" prong of the UCL must be tethered to specific constitutional, statutory, or regulatory provisions. (*Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917 [134 Cal.Rptr.2d 101] (*Scripps*); *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845 [128 Cal.Rptr.2d 389] (*Gregory*).) In this opinion, we analyze both tests, apply each to the allegations of the second amended complaint, and conclude the allegations do not satisfy either one. We respectfully suggest that our Legislature and Supreme Court clarify the definition of "unfair" in consumer actions under the UCL.

The "fraud" prong of the UCL requires that " 'members of the public are likely to be deceived' " by the challenged conduct (*Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1167 [93 Cal.Rptr.2d 439]). The second amended complaint did not allege facts showing that members of the public would assume or expect DCC to use cast-iron exhaust manifolds.

Plaintiffs' claim for violation of the CLRA fails because the second amended complaint did not allege facts showing DCC was bound to disclose its use of tubular steel exhaust manifolds or the failure to disclose that fact would be otherwise misleading.

Finally, because plaintiffs' claims for unfair competition and violation of the CLRA fail, plaintiffs' cause of action for declaratory relief also fails to state a claim.

### The Allegations of the Second Amended Complaint and Procedural Background

Kurt Cotton and Josh Avery filed a proposed class action against DCC in November 2003. In December 2003, Cotton and Avery filed a first amended complaint which alleged five causes of action, including claims for violation of the UCL, violation of the CLRA, and declaratory relief. DCC demurred to the first amended complaint; the trial court sustained the demurrer with leave to amend based on the statute of limitations. Cotton and Avery moved for leave to file a second amended complaint to substitute Joshua Bardin for Kurt Cotton as the proposed class representative. The trial court granted the motion.

Bardin and Avery's second amended complaint contained claims only for violation of the UCL, violation of the CLRA, and declaratory relief. The second amended complaint alleged: (1) DCC "designed, manufactured, marketed, distributed and/or sold 4.0 liter, 6.0 cylinder Jeep Grand Cherokees for model years 1991 through early-1999, and Jeep Cherokees and Jeep Wranglers for model years 1991 through 1999" (the vehicles), which contained

exhaust manifolds made of tubular steel rather than cast iron; (2) "the standard in the industry for vehicles such as Jeeps has been to use cast iron exhaust manifolds, given the pronounced durability and longevity of cast iron"; (3) DCC "chose to utilize less expensive tubular steel exhaust manifolds in the VEHICLES which [DCC] knew prematurely cracked and failed much earlier than would a cast iron manifold"; (4) DCC "concealed these facts from the public for the purpose of (a) reaping excessive profits to the detriment of Plaintiffs . . . by selling replacement parts, and (b) gaining an unfair advantage over [DCC's] competitors by reducing the cost of goods sold, increasing profits and gaining market share"; (5) DCC "knew as early as 1991 that the tubular steel exhaust manifolds . . . would not last as long as the conventional cast iron exhaust manifolds" and "would fail at unacceptably high rates"; (6) DCC concealed these facts from plaintiffs and the public "in order to sell replacement parts, increase profits and gain market share"; (7) because DCC "omitted and concealed material facts about the exhaust manifolds from the public, members of the public were likely to have been deceived about the quality, performance, and durability of those manifolds"; (8) DCC "gained an unfair competitive advantage over other vehicle manufacturers and sellers who did not engage in the same deceptive conduct, and reaped additional profits through the sale of vehicles less expensive to make, and the sale of replacement parts"; (9) DCC did not disclose that it attempted to and did redesign the tubular steel manifold in or about 1998, "secretly withdrew the original tubular steel manifold from the market and ceased selling the same," and "ultimately abandoned the use of the cracked prone tubular steel manifold, . . . returning to the accepted industry standard of a more expensive and durable two-piece cast iron exhaust manifold"; (10) "Plaintiffs are lay persons and consumers, who reasonably rightfully assumed that the manifolds in [DCC's] vehicles were quality components and that, if not, [DCC] would comply with [its] obligations under the law to fully and promptly disclose the known defect in the inferior tubular steel exhaust manifold by fair notice"; (11) Bardin purchased and owns a 1998 Jeep Wrangler for which he paid $801 to replace the exhaust manifold discovered in August 2002 to be cracked; (12) $556 of the $801 Bardin paid to replace the exhaust manifold "went to [DCC] for the cost of the replacement part"; (13) Avery purchased and owns a 1993 Jeep Cherokee Sport; and (14) in July 2003, Avery was advised the exhaust manifold of that vehicle was cracked, but he has not had it repaired or replaced.

DCC demurred to the second amended complaint. The trial court sustained the demurrer without leave to amend, stating, " '[i]t is not necessary for a business practice to be "unlawful" in order to be subject to an action under the unfair competition law. "The 'unfair' standard, the second prong of [Business and Professions Code] section 17200, also provides an independent basis for relief. This standard is intentionally broad." The test of whether a

business practice is unfair "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the Court must weigh the utility of the Defendant's conduct against the gravity of the harm to the alleged victim . . . [Citations.]" [Citation.]' [Citation.] [¶] An 'unfair' business practice occurs when the practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. [Citation.] [¶] Here, the alleged business practice is not 'unfair' for purposes of [Business and Professions Code section] 17200. The exhaust manifolds were not guaranteed to last as those contained in other automobiles. As discussed in regard to prior demurrers, there cannot be a cause of action for breach of warranty with regard to the exhaust manifolds. [¶] Plaintiffs claim the unfair business practice here is the failure [of] Defendant to disclose the exhaust manifolds were not made from the cast iron, but from tubular steel, and that they had a higher than normal rate of premature failure. The failure to disclose such facts is not immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers in order to maintain a cause of action under [section] 17200. The burden on automobile manufacturers to disclose alternative mediums used in component parts or other cost savings measures used in the manufacture of automobiles would be huge compared to the benefit received by the automobile purchasing public. [¶] Because there is nothing inherently 'unfair' about Defendant's conduct, the causes of action for declaratory relief and CLRA fail." Plaintiffs appealed.[3]

DISCUSSION

I.

STANDARD OF REVIEW

" ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.]' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].)

---

[3] "We liberally construe [plaintiffs'] notice of appeal from the order sustaining the demurrer, a nonappealable order, to be from the subsequent judgment of dismissal." (*Groves v. Peterson* (2002) 100 Cal.App.4th 659, 666, fn. 2 [123 Cal.Rptr.2d 164].)

"On review of an order sustaining a demurrer without leave to amend, our standard of review is de novo, 'i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law.' [Citation.]" (*Santa Teresa Citizen Action Group v. State Energy Resources Conservation & Development Com.* (2003) 105 Cal.App.4th 1441, 1445 [130 Cal.Rptr.2d 392].)

## II.

### PLAINTIFFS FAILED TO ALLEGE FACTS SUFFICIENT TO STATE A CLAIM FOR UNFAIR COMPETITION.

Plaintiffs argue the second amended complaint stated a claim for unfair competition by alleging DCC "intentionally concealed a known defect in its Jeep vehicles for the specific purpose of creating and maintaining a lucrative after-market in the sale of replacement parts." They argue DCC's actions violated the unfair and fraud prongs of the UCL.

### A.

#### *The Second Amended Complaint Did Not State a Claim Under the "Unfair" Prong of the UCL.*

In analyzing whether the second amended complaint stated a claim for unfair com petition based on the "unfair" prong of the UCL, we address (1) the California Supreme Court's decision in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*); (2) whether the allegations of the second amended complaint satisfy the definition of "unfair" set forth in *Smith, supra,* 93 Cal.App.4th 700; (3) whether the allegations of the second amended complaint satisfy the definition of "unfair" set forth in *Scripps, supra,* 108 Cal.App.4th 917; and (4) the significant questions raised as a result of *Cel-Tech* and the subsequent division of opinion of appellate courts regarding the definition of "unfair" in consumer UCL actions.[4]

#### 1.

#### Cel-Tech, supra, *20 Cal.4th 163.*

Before the California Supreme Court's decision in *Cel-Tech, supra,* 20 Cal.4th 163, appellate courts had broadly construed the definition of the term

---

[4] We commend the Attorney General and Consumer Attorneys of California for the excellent amicus curiae briefs submitted by each in this appeal.

"unfair" within the meaning of the UCL. (See, e.g., *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530 [206 Cal.Rptr. 164] ["an 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers"]; *State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1104 [53 Cal.Rptr.2d 229] [" 'the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim' "].)

In *Cel-Tech, supra,* 20 Cal.4th 163, the California Supreme Court analyzed the definition of the term "unfair" in the context of a UCL action brought by several businesses against a competitor. The defendant, Los Angeles Cellular Telephone Company (L.A. Cellular), was licensed by the federal government to provide cellular telephone service in the Los Angeles area. (*Id.* at p. 169.) In addition to selling cellular telephone service, L.A. Cellular sold cellular telephones. (*Ibid.*) Several companies (the plaintiffs), which were not licensed to provide cellular service and only sold cellular telephones, sued L.A. Cellular for, inter alia, violation of the UCL on the ground L.A. Cellular " 'formulated a strategy of selling cellular telephones below cost in order to increase the number of subscribers to its cellular telephone service.' " (*Id.* at pp. 168–169.) Following the close of the plaintiffs' case-in-chief, the trial court granted L.A. Cellular's motion for judgment under Code of Civil Procedure section 631.8, finding that because the plaintiffs' claim under the Unfair Practices Act failed, their UCL claim "necessarily failed." (*Cel-Tech,* at p. 170.) The appellate court reversed the judgment as to the UCL claim only, and remanded that claim for retrial on the ground L.A. Cellular's actions might have resulted in a violation of the UCL. (*Ibid.*)

In *Cel-Tech, supra,* 20 Cal.4th 163, 180, the California Supreme Court discussed the broad scope of the UCL and how, unlike the Unfair Practices Act, "it does not proscribe specific practices. Rather, . . . it defines 'unfair competition' to include 'any unlawful, unfair or fraudulent business act or practice.' [Citation.] [Fn. omitted.] Its coverage is 'sweeping, embracing " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' [Citations.] It governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.' [Citations.] By proscribing 'any unlawful' business practice, '[Business and Professions Code] section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable. [Citations.] [¶] However, the law does more than just borrow. The statutory language referring to 'any unlawful, unfair *or* fraudulent' practice . . . makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. 'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or

practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' " ■ The court further stated the Legislature intentionally made the UCL broad " 'to enable judicial tribunals to deal with the innumerable " 'new schemes which the fertility of man's invention would contrive.' " ' " (*Id.* at p. 181 [" ' "When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one" ' "].)

The Supreme Court acknowledged, "[a]lthough the unfair competition law's scope is sweeping, it is not unlimited. Courts may not simply impose their own notions of the day as to what is fair or unfair." (*Cel-Tech, supra,* 20 Cal.4th at p. 182.) The court criticized prior appellate court definitions of "unfair" in *People v. Casa Blanca Convalescent Homes, Inc., supra,* 159 Cal.App.3d at page 530 and *State Farm Fire & Casualty Co. v. Superior Court, supra,* 45 Cal.App.4th at page 1104, as "too amorphous" and providing "too little guidance to courts and businesses." (*Cel-Tech,* at pp. 184–185.) The court stated, "[v]ague references to 'public policy,' for example, provide little real guidance. ' "[P]ublic policy" as a concept is notoriously resistant to precise definition, and . . . courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, "lest they mistake their own predilections for public policy which deserves recognition at law." ' [Citation.] These concerns led us to hold that to establish the tort of wrongful discharge in violation of public policy, the public policy triggering the violation must be tethered to a constitutional or statutory provision [citation] or a regulation carrying out statutory policy." (*Id.* at p. 185.) The court further stated, "[a]n undefined standard of what is 'unfair' fails to give businesses adequate guidelines as to what conduct may be challenged and thus enjoined and may sanction arbitrary or unpredictable decisions about what is fair or unfair. In some cases, it may even lead to the enjoining of *pro*competitive conduct and thereby undermine consumer protection, the primary purpose of the antitrust laws. . . . [¶] Accordingly, we believe we must devise a more precise test for determining what is unfair under the unfair competition law." (*Ibid.*)

■ The court held, "to guide courts and the business community adequately and to promote consumer protection, we must require that any finding of unfairness to competitors under [Business and Professions Code] section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition. We thus adopt the following test: When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its

effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech, supra*, 20 Cal.4th at pp. 186–187.)

In a footnote, the court added, "[t]his case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context. Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law such as 'fraudulent' or 'unlawful' business practices or 'unfair, deceptive, untrue or misleading advertising.' " (*Cel-Tech, supra*, 20 Cal.4th at p. 187, fn. 12.)

Following the California Supreme Court's decision in *Cel-Tech, supra*, 20 Cal.4th 163, appellate court opinions have been divided over whether the definition of "unfair" under the UCL as stated in *Cel-Tech* should apply to UCL actions brought by consumers. (Compare, e.g., *Smith, supra*, 93 Cal.App.4th at p. 720, fn. 23 ["we are not to read *Cel-Tech* as suggesting that such a restrictive definition of 'unfair' should be applied in the case of an alleged *consumer* injury"] with *Scripps, supra*, 108 Cal.App.4th at p. 940 [applying to consumer UCL action requirement set forth in *Cel-Tech* that a UCL claim be tethered to a legislatively declared policy].) We do not need to decide whether *Smith* or *Scripps* applied the correct definition of "unfair" in UCL actions brought by consumers because, as discussed *post*, the second amended complaint failed to allege unfair conduct under both the *Smith* and *Scripps* lines of cases.

### 2.

*The second amended complaint did not allege unfair conduct under* Smith, supra, *93 Cal.App.4th 700.*

In sustaining DCC's demurrer, the trial court relied on the definition of "unfair" applied in *Smith, supra*, 93 Cal.App.4th 700. Citing footnote 12 of *Cel-Tech, supra*, 20 Cal.4th at page 187, in which the Supreme Court expressly limited its discussion in that case to UCL actions brought by competitors, the appellate court in *Smith* held the *Cel-Tech* definition of "unfair" should not be applied to UCL actions brought by consumers. (*Smith*, at p. 720, fn. 23; see also *South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 887, fn. 24 [85 Cal.Rptr.2d 301] [Supreme Court's criticism of definition of "unfair" in *Cel-Tech* "was expressly limited to the competitor context and specifically stated not to relate to 'actions by consumers' "]; *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.* (2002) 104 Cal.App.4th 508, 516, fn. 4 [128 Cal.Rptr.2d 463] [in *Cel-Tech*, California Supreme Court "developed a definition but expressly limited it to

anticompetitive cases and excluded cases such as the one at bar involving injury to consumers"]; *Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1425, fn. 15 [120 Cal.Rptr.2d 392].) Agreeing with *Smith* that the *Cel-Tech* definition of "unfair" should not be applied to consumer cases, the appellate court in *Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 286 [37 Cal.Rptr.3d 434], stated, "we believe [Business and Professions Code] section 17200's 'unfair' prong should be read more broadly in consumer cases because consumers are more vulnerable to unfair business practices than businesses and without the necessary resources to protect themselves from sharp practices. One of the major purposes of section 17200 is to protect consumers from nefarious business practices."

In its amicus curiae brief in this case, Consumer Attorneys of California argues *Cel-Tech*'s definition of "unfair" only makes sense in the limited context of a UCL action brought by a competitor: "Because the Supreme Court was so rigorous in expressly confining this new definition of unfair conduct to actions brought by direct competitors for antitrust-like activity, it would violate all the usual principles of case interpretation to extend that rule to other actions." Consumer Attorneys of California further argues, "the Supreme Court in *Cel-Tech* was very rigorous in limiting its discussion about what constitutes unfairness to the context of the case, i.e., anti-competitive conduct alleged by a competitor. Tethering the definition of what constitutes 'unfair' conduct in that context to the antitrust laws themselves obviously pushes the definition of unfair toward the 'unlawful' end of the continuum: It's not actually unlawful, but it looks, smells and feels like the conduct is unlawful. . . . [¶] But to extend that limited definition of what constitutes unfair conduct to the general consumer's interest is not only unwarranted, it essentially writes the unfair prong out of the statute. Although there are a number of consumer protection laws to which the unfair prong could be tethered, there is just as much reason to expect that businesses that want to engage in 'sharp practices' will find ways around those laws and will engage in conduct that is not even the general subject of any law."

■ Citing the holding of *People v. Casa Blanca Convalescent Homes, Inc., supra,* 159 Cal.App.3d 509, the court in *Smith, supra,* 93 Cal.App.4th at pages 718–719, stated, " 'an "unfair" business practice occurs when that practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." ' " The appellate court in *Smith* also cited the holding of *State Farm Fire & Casualty Co. v. Superior Court, supra,* 45 Cal.App.4th at pages 1103–1104, that " '[t]he test of whether a business practice is unfair "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." ' " (*Smith,* at p. 718; see also

*Pastoria v. Nationwide Ins., supra*, 112 Cal.App.4th 1490, 1498 [agreeing with *Smith* that the test for unfairness under the UCL in a consumer context is weighing the impact of the act on the alleged victim against the reasons, justifications and motives of the alleged wrongdoer]; *Progressive West Ins. Co. v. Superior Court, supra*, 135 Cal.App.4th at p. 286 ["We conclude that the balancing test should continue to apply in consumer cases"]; *People ex rel. Renne v. Servantes* (2001) 86 Cal.App.4th 1081, 1095 [103 Cal.Rptr.2d 870] [in determining whether business practice was unfair within meaning of UCL, court applied test whether "the gravity of the harm to the victim outweighs the utility of the defendant's conduct"].)[5]

The *Smith* court further stated, " '[e]xamples of unfair business practices include: charging a higher than normal rate for copies of deposition transcripts (by a group of certified shorthand reporters), where the party receiving the original is being given an undisclosed discount as the result of an exclusive volume-discount contract with two insurance companies [citation]; placing unlawful or unenforceable terms in form contracts [citation]; asserting a contractual right one does not have [citations]; systematically breaching a form contract affecting many consumers [citation], or many producers [citation]; and imposing contract terms that make the debtor pay the collection costs [citation].' " (*Smith, supra*, 93 Cal.App.4th at p. 719.)

In *Smith, supra*, 93 Cal.App.4th 700, 704–706, the plaintiffs filed a class action against several insurance companies (which provided approximately 80 percent of the automobile liability insurance sold in California) for, inter alia, issuing separate policies for each insured's multiple cars and refusing to permit any waiver of uninsured motorist coverage that did not include all of the insured's vehicles. The court held, "[s]uch conduct is at least generally alleged by plaintiffs and, it is also alleged, was done for the purpose of requiring insureds to purchase more uninsured motorist coverage than was needed, all to the alleged increased premium benefit of the defendant insurers and to the injury and damage of insureds who were faced with the choice of paying wasteful increased premiums or going without *any* uninsured motorist coverage. [Fn. omitted.] We have no trouble concluding, given our review of the authorities discussed above, that such conduct, if proven, would constitute an unfair business practice actionable under the UCL." (*Id.* at p. 721.)

---

[5] In *In re Firearm Cases* (2005) 126 Cal.App.4th 959 [24 Cal.Rptr.3d 659], the appellate court focused on whether the challenged practice in a consumer UCL action caused substantial injury. The appellate court held, "[a]lthough the weighing test of the pre-*Cel-Tech* cases remains useful, the challenged practice must be the likely cause of substantial injury. [Citation.] The latter element was not supported by the plaintiffs' showing in this case." (*Id.* at p. 981.)

■ Here, the second amended complaint did not contain sufficient allegations to satisfy the definition of "unfair" set forth in *Smith, supra,* 93 Cal.App.4th at pages 718–719. The second amended complaint alleged an impact on plaintiffs in the form of the cost for the repair or replacement of the tubular steel exhaust manifold after an indeterminate number of miles. The second amended complaint alleged DCC's use of the less durable tubular steel exhaust manifolds was to earn "excessive profits . . . by selling replacement parts" and to gain "an unfair advantage over [DCC's] competitors by reducing the cost of goods sold, increasing profits and gaining market share."

Does the use of less expensive and less durable materials in the manufacture of DCC's vehicles to make more money violate public policy? No. The second amended complaint did not allege DCC made any representations regarding the composition of the exhaust manifolds. Plaintiffs did not allege any personal injury or safety concerns related to DCC's use of tubular steel exhaust manifolds. The second amended complaint did not allege DCC's use of tubular steel exhaust manifolds violated any warranty or other agreement.

■ On appeal, plaintiffs have not cited any legal authority supporting the position that DCC's use of the less expensive and less durable tubular steel exhaust manifolds violated public policy. Our research has not revealed any authority which supports plaintiffs' position. Indeed, the California Supreme Court's holding in *Seely v. White Motor Co.* (1965) 63 Cal.2d 9, 18 [45 Cal.Rptr. 17, 403 P.2d 145], supports the opposite position. Although in the context of a breach of warranty case, the Supreme Court in *Seely* stated the general public policy that a consumer can be "fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone." (*Ibid.*) As discussed *ante*, there are no allegations DCC ever made any representations regarding the performance of the tubular steel exhaust manifolds, and plaintiffs did not seek any damages for physical injuries.

Furthermore, we agree with the trial court that nothing about DCC's use of tubular steel exhaust manifolds, as alleged by plaintiffs in the second amended complaint, supports the conclusion DCC's conduct was immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. As stated in *Community Assisting Recovery, Inc. v. Aegis Security Ins. Co.* (2001) 92 Cal.App.4th 886, 894–895 [112 Cal.Rptr.2d 304], in the context of applying the *Smith* definition of "unfair," "[w]e recognize that unfair competition statutes have always been framed in 'broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable " 'new

schemes which the fertility of man's invention would contrive.' " [Citation.]' [Citation.] And we are mindful that what is unfair or fraudulent, unlike unlawfulness, is a question of fact, which involves an equitable weighing of all the circumstances, a process which usually precludes the court from sustaining a demurrer. [Citation.] However, we will affirm a judgment of dismissal where the complaint fails to allege facts showing that a business practice is unfair, unlawful or fraudulent." Here, plaintiffs failed to plead facts to show DCC engaged in an unfair business practice under *Smith.*[6]

### 3.

*The second amended complaint did not allege unfair conduct under* Scripps, supra, *108 Cal.App.4th 917.*

In *Gregory, supra,* 104 Cal.App.4th 845, 854, the appellate court disagreed with the use of the pre-*Cel-Tech* definition of "unfair" in *Smith,* stating, "*Cel-Tech,* however, may signal a narrower interpretation of the prohibition of unfair acts or practices in all unfair competition actions and provides reason for caution in relying on the broad language in earlier decisions that the court found to be 'too amorphous.' [Fn. omitted.] Moreover, where a claim of an unfair act or practice is predicated on public policy, we read *Cel-Tech* to require that the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions." (See also *Schnall v. Hertz Corp., supra,* 78 Cal.App.4th at p. 1166 [*Cel-Tech* holding that "*any* claims of unfairness under the UCL should be defined in connection with a legislatively declared policy" also applied to UCL actions brought by consumers]; *Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1072 [13 Cal.Rptr.3d 586] [in consumer UCL action, court stated, "given the Supreme Court's disapproval of *State Farm* [*Fire & Casualty Co. v. Superior Court, supra,* 45 Cal.App.4th 1093]'s 'amorphous' definition of 'unfair' practices and its focus on legislatively

---

[6] In *Progressive West Ins. Co. v. Superior Court, supra,* 135 Cal.App.4th at page 287, the appellate court stated, "[t]he balancing test required by the unfair business practice prong of [Business and Professions Code] section 17200 is fact intensive and is not conducive to resolution at the demurrer stage. ' "[U]nfairness" is an equitable concept that cannot be mechanistically determined under the relatively rigid legal rules applicable to the sustaining or overruling of a demurrer.' " *Progressive West* is distinguishable from our case because the complaint in that case alleged, inter alia, that the insurance company engaged in a practice of demanding 100 percent of the money it had paid out to policyholders under "med-pay coverage" without regard to its own obligations. (*Id.* at p. 286.) Such a practice, the appellate court held, "fits the language often used in conjunction with unfair business practices as ' "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." [Citation.]' " (*Ibid.*) Here, as discussed *ante,* the second amended complaint is devoid of allegations which state a basis for claiming DCC engaged in an unfair business practice under *Smith, supra,* 93 Cal.App.4th 700.

declared public policy, reliance on general common law principles to support a cause of action for unfair competition is unavailing"]; *Churchill Village, L.L.C. v. General Elec. Co.* (N.D.Cal. 2000) 169 F.Supp.2d 1119, 1130 & fn. 10 [holding *Cel-Tech*'s definition of unfair also applies to consumer UCL actions]; *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1147 [135 Cal.Rptr.2d 796] [court applied *Cel-Tech* test in consumer UCL action, stating "[t]o show a business practice is unfair, the plaintiff must show the conduct 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition' "].)

In *Scripps, supra*, 108 Cal.App.4th 917, 940, a decision by Division One of the Fourth Appellate District, the appellate court "agree[d] with the *Gregory*[, *supra*, 104 Cal.App.4th 845 [128 Cal.Rptr.2d 389]] court, which found that *Cel-Tech* narrowed the expansive earlier interpretations of the term 'unfair.' " In *Scripps*, the plaintiffs received medical care from Scripps Clinic through their medical insurance with Health Net. (*Scripps*, at p. 926.) After the plaintiffs filed a medical malpractice action against two physicians affiliated with Scripps, Scripps informed the plaintiffs that it was exercising its right under its contract with Health Net to have the plaintiffs transferred to another medical group. (*Id.* at pp. 926–927.) Health Net transferred the plaintiffs to University of California at San Diego Health Network. (*Id.* at p. 927.) The plaintiffs sued Scripps and one of its employees, contending, inter alia, Scripps violated the UCL. (*Ibid.*) The trial court denied the motion for summary adjudication as to Scripps, and Scripps filed a petition for a writ of mandate. (*Ibid.*)

██ The appellate court in *Scripps, supra*, 108 Cal.App.4th 917, 941, held the trial court erred by not granting summary adjudication of the unfair competition claim. The court stated, "*Cel-Tech* has left it unclear whether we still rely upon the earlier definitions of 'unfair,' which it criticized. We agree with the *Gregory* court, which found that *Cel-Tech* narrowed the expansive earlier interpretations of the term 'unfair' . . . '. . . to require that the public policy which is a predicate to the action must be "tethered" to specific constitutional, statutory or regulatory provisions.' " (*Id.* at p. 940.) The plaintiffs argued Scripps's transfer policy was unfair because it impeded a patient's right to sue for malpractice, in violation of his or her constitutional right to seek redress in the courts. (*Ibid.*) The appellate court disagreed, stating, "Scripps does not interfere with the malpractice action; it merely chooses not to treat the litigants once the decision to litigate has been communicated to Scripps." (*Ibid.*) The *Scripps* court further stated, "[t]he right upon which the [plaintiffs] actually rely is a patient's right to continuity of care from a physician of her choosing. But there is no such right. The physician-patient relationship is a contractual one. [Citations.] As we

discussed above, a physician can lawfully withdraw from treating a patient after notice and a reasonable time to secure another physician." (*Ibid.*)

Applying the definition of "unfair" set forth in *Scripps* and related cases, we conclude the second amended complaint failed to allege facts sufficient to satisfy that definition as well. Here, plaintiffs' UCL claim is based on the allegations that DCC knowingly used tubular steel exhaust manifolds in the vehicles without affirmatively advising customers of that fact; consequently, the exhaust manifolds of the vehicles required earlier repair or replacement than would have been the case had cast-iron exhaust manifolds been used instead. The second amended complaint did not allege the UCL claim is tethered to any constitutional, statutory or regulatory provision.

As in *Scripps*, the "right" upon which plaintiffs actually rely here—the right to have a vehicle containing an exhaust manifold that lasts as long as an "industry standard" cast-iron exhaust manifold—is one based on a contract such as a warranty, not on a legislatively declared policy. No law generally requires a manufacturer to use the most expensive or most durable materials in the manufacture of its products. Therefore, even if the trial court should have applied the *Scripps* definition of "unfair," the complaint failed to state a claim.[7]

4.

*Significant questions raised by* Cel-Tech *and the subsequent conflicting lines of appellate court authority.*

Even though the allegations of facts of this case have made it unnecessary for us to decide which definition of "unfair" in the UCL applies in consumer actions, our discussion shows the widening divide among appellate courts regarding this issue. In summary, one line of cases relies heavily on the Supreme Court's language in footnote 12 of *Cel-Tech, supra*, 20 Cal.4th at page 187, that "[n]*othing* we say relates to actions by consumers" (italics added), while the other line strongly relies on the Supreme Court's unqualified criticism in *Cel-Tech* of the definitions of "unfair" as set forth in *State Farm Fire & Casualty Co. v. Superior Court, supra*, 45 Cal.App.4th at page 1104 and *People v. Casa Blanca Convalescent Homes, Inc., supra*, 159 Cal.App.3d at page 530, both of which were UCL cases brought by consumers.

---

[7] We may affirm the trial court's order sustaining the demurrer for failure to allege facts sufficient to state a claim, based on the application of the definition of "unfair" not relied upon by the trial court. "We affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons." (*Wolkowitz v. Redland Ins. Co.* (2003) 112 Cal.App.4th 154, 162 [5 Cal.Rptr.3d 95].)

Did the Supreme Court limit its holding in *Cel-Tech* to UCL actions brought by competitors simply because the circumstance of a consumer UCL action was not before it, or because the definition of "unfair" should be different depending on whether the action is brought by a consumer or a competitor? Was the Supreme Court expressing the view that regulation of competitive conduct is contained in existing legislation, but there is no analogous law pertaining to consumers? Should a broader definition of "unfair" apply in consumer actions because consumers require more protection than competitors even though such a distinction between consumers and competitors is not reflected in the language of the statute? Is the *Cel-Tech* definition of "unfair" too narrow to sufficiently protect consumers? Is the definition of "unfair" applied in *Smith, supra,* 93 Cal.App.4th 700 too amorphous in the consumer context, and does it provide "too little guidance to courts and businesses"? (*Cel-Tech, supra,* 20 Cal.4th at pp. 184–185.)

In light of the uncertain state of the law regarding the proper definition of "unfair" in the context of consumer UCL actions, we urge the Legislature and the Supreme Court to clarify the scope of the definition of "unfair" under the UCL.

## B.

*Plaintiffs Did Not State a Cause of Action for Unfair Competition Based on the "Fraud" Prong of the UCL.*

 Plaintiffs allege the trial court erred by sustaining DCC's demurrer to the UCL claim because the second amended complaint "alleged that members of the public were likely to be deceived by DCC's business practices in connection with the sale of Jeep vehicles and that DCC had thus engaged in a fraudulent business act or practice" within the meaning of the "fraud" prong of the UCL. "In order to state a cause of action under the fraud prong of the UCL a plaintiff need not show that he or others were actually deceived or confused by the conduct or business practice in question. 'The "fraud" prong of [the UCL] is unlike common law fraud or deception. A violation can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. Instead, it is only necessary to show that members of the public are likely to be deceived.' " (*Schnall v. Hertz Corp., supra,* 78 Cal.App.4th at p. 1167.)[8]

---

[8] No party in this case raised the issue of the impact of Proposition 64 on this analysis. As we discuss, the second amended complaint did not sufficiently allege a UCL claim even based on the "fraud" prong as defined before the passage of Proposition 64. Therefore, we do not need to address the applicability of Proposition 64 to this case.

The second amended complaint stated, "[b]ecause [DCC] ha[d] omitted and concealed material facts about the exhaust manifolds from the public, members of the public were likely to have been deceived about the quality, performance, and durability of those manifolds." But this statement merely concludes the public would likely be deceived, without pleading any facts showing the basis for that conclusion. (See *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58] [demurrer admits all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law].) In order to be deceived, members of the public must have had an expectation or an assumption about the materials used in a DCC vehicle. The second amended complaint did not allege (1) members of the public had any expectation or made any assumptions that DCC's exhaust manifolds would be made from cast iron, as opposed to tubular steel, (2) the public had any expectation or made any assumptions regarding the life span of the exhaust manifold of a DCC vehicle, or (3) facts showing DCC had made any representation of any kind, much less any misrepresentation, regarding its vehicles. The second amended complaint's vague reference to plaintiffs' assumption that the exhaust manifolds were "quality components" is not sufficient.

## III.

### PLAINTIFFS DID NOT STATE A CLAIM FOR A VIOLATION OF THE CLRA.

Plaintiffs contend the trial court erred by sustaining DCC's demurrer to the cause of action for violation of the CLRA. " 'The Consumers Legal Remedies Act, enacted in 1970, "established a nonexclusive statutory remedy for 'unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer. . . .' [Citation.]" ' [Citation.] 'The self-declared purposes of the act are "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." [Citation.]' [Citation.] The Consumers Legal Remedies Act is supplemental to remedies available under other statutory and case law; moreover, actions brought under the act are governed exclusively by its own provisions. [Citations.] [¶] Any consumer who suffers any damage as a result of the use or employment by any person of a method, act or practice declared to be unlawful by [Civil Code] section 1770 may bring an action against that person to recover actual damages, injunctive relief, restitution of property, punitive damages, and any other relief the court deems proper." (*Wang v. Massey Chevrolet* (2002) 97 Cal.App.4th 856, 869 [118 Cal.Rptr.2d 770].)

With regard to plaintiffs' claim for violation of the CLRA, the second amended complaint alleged, "[DCC's] failure to disclose material facts concerning the exhaust manifolds for the subject VEHICLES, and concealment of this known inferior part, and other conduct as alleged herein, was intended by [DCC] to result in Plaintiffs and members of the Class purchasing the VEHICLES." Citing *Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30 [124 Cal.Rptr. 852], the second amended complaint further alleged, "[s]uch conduct violated, and continues to violate, Section 1770 of the California Civil Code which, under established decisional law, proscribes active concealment and suppression of material facts such as those which [DCC] willfully failed to disclose."

■ Among the 23 expressly prohibited acts set forth in Civil Code section 1770, subdivision (a), are making representations that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have," and that "goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." (Civ. Code, § 1770, subd. (a)(5) & (7).) In *Outboard Marine Corp. v. Superior Court, supra,* 52 Cal.App.3d 30, 36–37, the appellate court held that section 1770 prohibited concealment or suppression of material facts: "It is fundamental that every affirmative misrepresentation of fact works a concealment of the true fact. . . . [¶] Fraud or deceit may consist of the suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact."

Plaintiffs' claim for violation of the CLRA fails because the second amended complaint neither alleged facts showing DCC was "bound to disclose" its use of tubular steel exhaust manifolds, nor alleged facts showing DCC ever gave any information of other facts which could have the likely effect of misleading the public "for want of communication" of the fact it used tubular steel exhaust manifolds. The second amended complaint did not allege a single affirmative representation by DCC regarding the exhaust manifolds.

## IV.

### BECAUSE PLAINTIFFS DID NOT STATE A CLAIM FOR A VIOLATION OF THE UCL OR FOR A VIOLATION OF THE CLRA, PLAINTIFFS' CLAIM FOR DECLARATORY RELIEF FAILS.

The second amended complaint's cause of action for declaratory relief was based entirely on the allegations of plaintiffs' claims for violation of the UCL

and violation of the CLRA. Incorporating the previously stated allegations of those two claims, the declaratory relief claim alleged, "[a]n actual controversy has arisen and now exists between Plaintiffs and [DCC] concerning their respective rights and duties regarding the cost of repairing and/or replacing exhaust manifolds which have cracked and/or may crack before the expiration of the life of the vehicle." The second amended complaint further stated, "[p]laintiffs desire a judicial determination pursuant to California Code of Civil Procedure Section 1060 of their rights and [DCC's] duties regarding the cost of repairing and/or replacing exhaust manifolds which have cracked and/or may crack before the expiration of the life of the vehicle, as well as a declaration by the Court that Defendant DCC will be responsible for the cost of repairing and/or replacing the exhaust manifolds on individual Class members' VEHICLES when cracking in fact manifests itself in individual Class members' VEHICLES."

As discussed *ante*, plaintiffs failed to state claims for unfair competition and violation of the CLRA. There are no other facts that reveal an actual controversy exists between the parties. Therefore, the second amended complaint did not state a claim for declaratory relief. (See *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79 [124 Cal.Rptr.2d 519, 52 P.3d 695] [" 'The fundamental basis of declaratory relief is the existence of an *actual, present controversy* over a proper subject' "].)

## V.

### THE TRIAL COURT DID NOT ERR BY SUSTAINING DCC'S DEMURRER WITHOUT LEAVE TO AMEND.

When a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan, supra*, 39 Cal.3d 311, 318.) Plaintiffs do not argue the trial court should have granted them leave to amend the second amended complaint, and they do not otherwise argue there is a reasonable possibility the defects in their pleading of their claims can be cured by amendment. We therefore conclude the trial court did not abuse its discretion by sustaining DCC's demurrer to the claims without leave to amend.

## DISPOSITION

The judgment is affirmed. Respondent is to recover costs on appeal.

Sills, P. J., and Aronson, J., concurred.