Martin EHRLICH, individually, and on behalf of a class of similarly situated individuals; Plaintiff,

v.

**BMW OF NORTH AMERICA, LLC; Defendant.**

**No. CV 10–1151 ABC (PJWx).**

United States District Court, C.D. California, Western Division.

Aug. 11, 2010.

David Michael Medby, Gene F. Williams, Mark P. Estrella, Sue Jin Kim, Initiative Legal Group APC, Payam Shahian, Strategic Legal Practices, APC, Los Angeles, CA, Dara Tabesh, Erotech Law Group PC, San Francisco, CA, Robert L. Starr, Law Office of Robert L. Starr, Woodland Hills, CA, for Plaintiff.

Roy M. Brisbois, Eric Y. Kizirian, Lewis Brisbois Bisgaard and Smith LLP, Los Angeles, CA, for Defendant.

ORDER RE: MOTION TO DISMISS CLASS ACTION COMPLAINT OF PLAINTIFF MARTIN EHRLICH PURSUANT TO FED. R. CIV. P. 12(b)(6)

AUDREY B. COLLINS, District Judge.

Pending before the Court is Defendant BMW of North America, LLC's ("BMW's") Motion to Dismiss Class Action Complaint of Plaintiff Martin Ehrlich Pursuant to Fed.R.Civ.P. 12(b)(6), filed on May 7, 2010. Plaintiff Martin Ehrlich opposed on June 28, 2010 and BMW replied on July 12, 2010. The Court found the matter appropriate for resolution without oral argument and vacated the August 9, 2010 hearing date. Fed.R.Civ.P. 78; Local Rule 7–15. For the reasons below, the motion is GRANTED IN PART and DENIED IN PART. Leave to amend is GRANTED within the limits discussed below.

## FACTUAL ALLEGATIONS [1]

Plaintiff has brought this action against BMW on his own behalf and "on behalf of

---

1. The facts are taken from Plaintiff's First Amended Complaint. (Docket No. 4.) The Court also GRANTS BMW's request for judicial notice of Exhibits 1 and 2 of the Kizirian Declaration, which are the relevant express warranty for Plaintiff's MINI and the "Technical Service Bulletin" alleged in the FAC. *See Knievel v. ESPN,* 393 F.3d 1068, 1076 (9th Cir.2005) (stating that a court may consider documents "whose contents are alleged in a complaint and whose authenticity no party

all similarly situated persons who own or lease, or have owned or leased ... certain defective vehicles manufactured and sold by" BMW. (First Amended Compl. ("FAC") ¶ 1.) He alleges that BMW designed, manufactured, and sold BMW MINIs from 2001 to 2010 that it knew contained a design flaw that caused the windshield in those vehicles to have a high propensity to crack or chip under circumstances that would not cause non-defective windshields to similarly fail. (FAC ¶¶ 2–3.)

Plaintiff purchased a new 2005 BMW Mini Cooper S from a BMW dealer in Monrovia, California in December of 2004. (FAC ¶ 20.) In March 2008, the windshield of Plaintiff's Mini cracked when he used the sponge portion of a squeegee on it at a gas station. (FAC ¶ 21.) At that time, Plaintiff's MINI had approximately 51,933 miles on it (FAC ¶ 22), which was beyond the New Car Warranty of 4 years or 50,000 miles, whichever occurs first (FAC ¶ 67; Kizirian Decl., Ex. 1 at 4). When he brought it into a BMW dealership, the dealer informed him that the windshield would not be covered by his warranty, so Plaintiff paid $929.14 to replace it. (FAC ¶ 22.) In November 2008, the replacement windshield cracked while the vehicle was parked overnight in Plaintiff's garage, so Plaintiff paid $225 to replace the second windshield with a non-MINI windshield. (FAC ¶ 23.)

Many putative class members have reported that their windshields also have cracked or broken for no apparent reason; others reported that even slight impacts would cause windshields to crack. (FAC ¶ 34.) Replacement windshields suffer from the same defect, forcing some class members to replace their windshields multiple times. (FAC ¶ 35.) In the FAC,

Plaintiff has quoted several complaints from consumers about cracking windshields, which were posted on the National Highway Traffic Safety Administration ("NTHSA") website. (FAC ¶ 35.)

BMW learned about the cracking defect from sources unavailable to the class, such as through pre-release testing data, early consumer complaints to BMW and dealers, testing done in response to complaints, replacement part sales data, aggregate data from BMW dealers, and other internal sources. (FAC ¶ 37.) Despite its awareness, BMW has actively concealed the existence and nature of the cracking defect at the time Plaintiff and class members purchased their Minis and after, forcing Plaintiff and the class to pay for repair and replacement of cracked windshields. (FAC ¶¶ 38–39.)

BMW has engaged in a "very aggressive marketing campaign" to lure customers to purchase MINIs by promoting safety features, such as airbags, traction and stability control, and strong occupant safety cage construction, in part because the Mini is a small car and has a higher propensity to cause passenger injuries in multiple-vehicle accidents. (FAC ¶¶ 41–45 & n. 1.) In the FAC, Plaintiff quotes several statements on BMW's website and marketing materials discussing these safety features, including one statement under a section entitled "Collision Protection" that "each critical section of a MINI is ingeniously designed to absorb and spread energy in a manner that will keep harms as far away from the passenger as possible" and "what should be increasingly clear is that almost every component of the car helps to protect its Motorers at all times." (FAC ¶¶ 43–45.)

questions, but which are not physically attached to the [plaintiff's] pleading." (brackets in original)).

Although Plaintiff does not identify any marketing or other materials that so state, Plaintiff alleges that the windshield is part of a MINI's safety restraint system ("SRS"), playing a "major role in the structural integrity of a vehicle's passenger compartment," so the windshield's propensity to crack poses a safety risk. (FAC ¶¶ 5–7.) For example, if a MINI with a cracked windshield is in a roll-over accident, the windshield can become dislodged, compromising roof-crush resistance. (FAC ¶ 52.) This could cause serious head and neck injuries, failure of the passenger side airbag to deploy, or the ejection of passengers from the vehicle. (FAC ¶ 52.) Moreover, a cracked windshield would not protect passengers from frontal penetration. (FAC ¶ 52.) Plaintiff has not alleged that any class members have actually been injured in these kinds of accidents because the windshield has a propensity to crack.

In order to conceal the cracking defect it knew about prior to selling any MINIs, BMW has instructed dealers to conduct a "pen test." (FAC ¶ 48.) The test involves tracing a windshield crack with pen and if the pen hangs up on the slightest pit or blemish, that is deemed evidence of an impact, and dealers have been instructed to refuse coverage under warranty in that circumstance. (FAC ¶ 49.) According to Plaintiff, the pen test can and does frequently produce false positives, but BMW nevertheless uses it as a reason to deny warranty coverage. (FAC ¶ 48–50.)

Although some class members have paid for four or more replacement windshields, Plaintiff claims that replaced MINI windshields still do not provide the same level of occupant protection as the factory-installed windshield. (FAC ¶ 51.) For example, the majority of replacements are performed incorrectly. (FAC ¶ 53.) Likewise, the conditions of factory installation are optimal for the seal between the windshield and vehicle, and those conditions cannot be replicated by a replacement. (FAC ¶ 53.) Thus, a replaced windshield cannot provide appropriate support during a roll-over accident or withstand passenger-side airbag deployment, which puts additional stress on the windshield in an accident. (FAC ¶ 53.)

In February 2009, BMW issued a Technical Service Bulletin ("TSB"), which Plaintiff alleges contains evidence that BMW acknowledged the windshield defect, but attempted to attribute the problem to "very isolated circumstances": "Under very isolated circumstances, a stress crack may form due to a combination of glass position and heavy torsional loads on the body of the vehicle. These cracks always start from an outside edge of the glass. Most often the cracks begin at one of the corners of the windshield." (FAC ¶¶ 55–57, 63; Kizirian Decl., Ex. 2.) The TSB directs dealers to replace the windshield and submit the repair order "for a warranty claim where a stress crack is the root cause." (FAC ¶ 56.) The TSB calls for using the pen test to determine whether the crack is due to "outside influence": "Run a non-permanent felt tip pen or small marker over the length of the damaged area. Even very minor surface damage will be felt." (Kizirian Decl., Ex. 2.)

In Plaintiff's view, the purpose of the TSB was two-fold: to make it appear to government regulators, courts, and class members that BMW has taken affirmative steps to resolve the windshield-cracking issue; and to make it appear that the cracking defect is less extensive than it actually is. (FAC ¶ 57.) Both before and after the TSB, for some vehicles like Plaintiff's that suffered stress cracks beyond the 4–year/50,000 mile MINI New Passenger Car Limited Warranty, or for vehicles with cracks attributed to influences other than stress, BMW allegedly instituted a

clandestine program to secretly pay for windshield replacements to mollify customers who complained loudly enough. (FAC ¶ 67.) Plaintiff was not among those consumers who obtained payment from BMW after complaining about replacing his cracked windshields.

Plaintiff alleges that, had class members known about the defective windshields, they would have had the opportunity to factor the existence of the defect into their decisions to purchase MINI vehicles. (FAC ¶ 60.) Class members would have also had the chance to present cracked windshields for warranty repairs. (FAC ¶ 60.)

Plaintiff has alleged four causes of action under California law: (1) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ.Code § 1750 *et seq.*; (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code § 17200, based upon a violation of California's Secret Warranty Law, Cal. Civ.Code § 1795.90 *et seq.*; (3) violation of the UCL for acts other than violating the Secret Warranty Law; and (4) breach of implied warranty under the Song–Beverly Consumer Warranty Act, Cal. Civ.Code §§ 1792 and 1791.1 *et seq.*

For the first cause of action, Plaintiff claims that, under the CLRA, the class members are "consumers," and BMW violated California Civil Code section 1770(a)(5) and (7) by representing that the MINI windshields had characteristics and benefits that they did not have and were of a particular standard and quality when they were not, and by knowingly deceiving the purchasing public with representations that created serious safety risks. (FAC ¶ 91.) Plaintiff also alleges that BMW had a duty to disclose the defective windshields because it was in a superior position to know of the safety defect, it actually knew about the defect, and Plaintiff and the class could not have reasonably discovered the defect until the windshields cracked. (FAC ¶¶ 93–94.) Plaintiff alleges the windshield defect is material because reasonable consumers would have considered the information important in deciding to purchase a MINI or would have paid a lesser price for a MINI. (FAC ¶ 96.) Class members reasonably expected their windshields to last for the life of their vehicles. (FAC ¶ 97.)

For Plaintiff's second claim under the UCL for an "unlawful" practice of violating the Secret Warranty Law, Plaintiff alleges that a "secret warranty" is created when an automaker establishes a policy to pay for repair of a defect without making either the defect or the repair policy known to the general public. (FAC ¶ 61.) This usually occurs in situations where a large number of consumers complain about a defect not covered by a factory warranty, but the manufacturer decides to offer warranty coverage to individual consumers when they complain. (FAC ¶ 61.) The secret warranty can manifest itself in TSBs issued by a manufacturer to local dealers, instructing dealers on addressing the defect for consumers who complain. (FAC ¶ 61.)

Plaintiff alleges that BMW had a secret warranty because it would replace windshields for customers who complained loudly enough, even though those customers' express warranties had expired or the crack was attributed to something other than stress. (FAC ¶ 67.) Code names for this policy were "good-will adjustments" or "policy adjustments." (FAC ¶ 67.) As a result, BMW violated the Secret Warranty Law (and the UCL) by failing to notify all consumers of the warranty and by refusing to reimburse consumers for windshield replacement costs. (FAC ¶ 68.)

Plaintiff's non-Secret-Warranty-Act UCL claims rest on his allegations that BMW engaged in unfair competition and

engaged in unlawful, unfair, and fraudulent business practices by knowingly concealing the cracking defect when it had a duty to disclose it—a practice capable of deceiving a substantial portion of the purchasing public. (FAC ¶¶ 116–17.)

Finally, Plaintiff's claim under the Song–Beverly Act rests upon his allegations that BMW provided consumers with an implied warranty that MINIs and their parts were merchantable and fit for the ordinary purpose for which they were sold: safe and reliable transportation. (FAC ¶ 127.) That implied warranty was breached by the cracking defect, which rendered the MINIs not reliable, durable, or safe for transportation. (FAC ¶ 127.)

## LEGAL STANDARD

The Supreme Court has recently clarified the level of pleading necessary to survive a motion to dismiss under Rule 12(b)(6). *See Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1950–52, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557–58, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Federal Rule of Civil Procedure 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief," which does not require "detailed factual allegations," but it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at ——, 129 S.Ct. at 1949. A claim must be "plausible on its face," which means that the Court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.; see Twombly,* 550 U.S. at 556, 570, 127 S.Ct. 1955. In other words, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations and alterations omitted). Allegations of fact are taken as true and construed in the light most favorable to the nonmoving party. *See Newdow v. Lefevre,* 598 F.3d 638, 642 (9th Cir.2010).

In analyzing the sufficiency of the complaint, the Court must first look at the requirements of the causes of action alleged. *See Iqbal,* 556 U.S. at ——, 129 S.Ct. at 1947. The Court may then identify and disregard any legal conclusions, which are not subject to the requirement that the Court must accept as true all of the allegations contained in the complaint. *Id.* at ——, 129 S.Ct. at 1949. The Court must then decide whether well-pleaded factual allegations, when assumed true, "plausibly give rise to an entitlement to relief." *Id.* at ——, 129 S.Ct. at 1950. In doing so, the Court may not consider material beyond the pleadings, but may consider judicially noticeable documents, documents attached to the complaint, or documents to which the complaint refers extensively or which form the basis of the plaintiff's claims in the complaint. *See United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003).

## DISCUSSION

### A. Duty to Disclose under the UCL and CLRA

The CLRA prohibits certain acts that are "unfair" or "deceptive," including:

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.

· · ·

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a

particular style or model, if they are of another.

Cal. Civ.Code § 1770(a)(5) & (7). The UCL similarly prohibits "fraudulent" business practices. Cal. Civ.Code § 17200.

■■■ In a fraudulent omissions case like this one,[2] a plaintiff can state a cause of action when the " 'omission [is] contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obligated to disclose.' " *Falk v. Gen. Motors Corp.*, 496 F.Supp.2d 1088, 1094–95 (N.D.Cal.2007) (brackets in original). The plaintiff may allege an "obligation to disclose" a defect in one of four ways: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant has exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *Id.* at 1095. Plaintiff does not allege a fiduciary relationship with BMW or argue that BMW made only partial representations about windshields. Therefore, the Court focuses on the second and third grounds to determine whether a duty to disclose exists.

■■■ In an omissions case, omitted information is material if a plaintiff can allege that, "had the omitted information been disclosed, one would have been aware of it and behaved differently." *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1093, 23 Cal. Rptr.2d 101, 858 P.2d 568 (1993); *see also Falk*, 496 F.Supp.2d at 1095 (same). Materiality is viewed from the prospective of the reasonable consumer. *Falk*, 496 F.Supp.2d at 1095.

BMW argues that materiality cannot exist in this case because Plaintiff's defective

windshield cracked after the expiration of the express warranty on his MINI. *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026–27 (9th Cir.2008); *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App.4th 824, 834–39, 51 Cal.Rptr.3d 118 (Ct.App.2006); *see also Bardin v. Daimlerchrysler Corp.*, 136 Cal.App.4th 1255, 1276, 39 Cal.Rptr.3d 634 (Ct.App.2006). In *Daugherty*, the plaintiffs sued an automobile manufacturer for failing to disclose an engine defect that did not cause malfunctions in vehicles until after an express warranty expired. 144 Cal.App.4th at 827, 51 Cal.Rptr.3d 118. The court sustained the defendant's demurrer to the plaintiffs' CLRA claims because the plaintiffs failed to identify "any representation by Honda that its automobiles had any characteristic they do not have, or are of a standard or quality they are not." *Id.* at 834, 51 Cal. Rptr.3d 118. The plaintiffs were obligated to allege "suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact," *Bardin*, 136 Cal.App.4th at 1276, 39 Cal.Rptr.3d 634, which they failed to do in light of the engine's performance during the express warranty period, *Daugherty*, 144 Cal.App.4th at 836, 51 Cal.Rptr.3d 118. In light of the express warranty, "[t]he only expectation buyers could have had about the F22 engine was that it would function properly for the length of Honda's express warranty, and it did. Honda did nothing that was likely to deceive the general public by failing to disclose that its F22 engine might, in the fullness of time, eventually dislodge the front balancer shaft oil seal and cause an oil leak." *Id.* at 838, 51 Cal.Rptr.3d 118.

---

2. Plaintiff does not say so explicitly, but the Court interprets his fraud-based UCL and CLRA allegations as claiming fraudulent omissions, which rest on BMW's failure to disclose the cracking defect.

Similarly, in *Clemens,* the plaintiff sued an automaker for defective head gaskets in certain vehicles, claiming that the defendant concealed the defect during an express warranty period. 534 F.3d at 1021. The Ninth Circuit affirmed summary judgment for the defendant on the plaintiff's fraud claims under the UCL based on *Bardin* and *Daugherty,* explaining that California courts have viewed post-warranty fraudulent concealment claims with "some skepticism." *Id.* at 1026. The court found that the plaintiff "produced no evidence to suggest that a reasonable consumer would have expected or assumed any particular head gasket lifespan in excess of the warranty period" and the evidence in the record did not establish that the warranty period for the gasket was material to the plaintiff's own purchasing decision. *Id.*

Plaintiff points out that *Clemens, Daugherty,* and *Bardin* did not involve alleged safety defects, which Plaintiff argues are material facts that can, in fact, create a duty to disclose, even when a defect does not occur until after an express warranty expires. For example, in *Daugherty,* the court took care to note that the case did not involve a defect that created an "unreasonable risk" to the safety of consumers, and suggested that a safety-based duty to disclose might exist in some circumstances: "The complaint is devoid of factual allegations showing any instance of

physical injury or any safety concerns posed by the defect." 144 Cal.App.4th at 836, 51 Cal.Rptr.3d 118; *see also Bardin,* 136 Cal.App.4th at 1270, 39 Cal.Rptr.3d 634 (noting that plaintiffs "did not allege any personal injury or safety concerns related to" the alleged defect).[3]

The district court in *Falk* interpreted this language in *Daugherty* to provide the safety exception on which Plaintiff relies. 496 F.Supp.2d at 1094. In *Falk,* the plaintiffs brought both CLRA and UCL fraudulent omissions claims, alleging that the speedometers in the defendant's vehicles ceased to function properly after the vehicles' express warranty expired. *Id.* at 1092. The court explained that "*Daugherty* emphasized that an 'unreasonable' safety risk would lead to a duty to disclose" and concluded that a duty to disclose existed under the circumstances. *Id.* at 1094. The court refused to dismiss the CLRA claim based upon *Daugherty* and *Bardin,* finding instead a duty to disclose because the plaintiffs alleged that the faulty speedometers could cause vehicles to travel at "unsafe speeds" and could cause accidents. *Id.* at 1096 & n. *. Those allegations constituted material facts and distinguished the case from *Daugherty,* where no safety issues were alleged. *Id.* The court also refused to dismiss the UCL fraud claim for the same reason. *Id.* at 1098.[4]

---

**3.** Counsel for BMW was also counsel for Honda in *Daugherty* and he notes that the issue of safety was not pled or argued in the trial court, and was raised only in a reply brief on appeal, prompting the court at oral argument to decline to consider the issue. Even if true, the written and published opinion in *Daugherty* left open the possibility of a safety exception.

**4.** Other courts have recognized the safety exception in *Daugherty. See, e.g., Marsikian v. Mercedes Benz USA, LLC,* No. CV 08–4876 AHM (JTLx), 2009 WL 8379784, at *5–7, 2009

U.S. Dist. LEXIS 117012, at *13–17 (C.D.Cal. May 4, 2009); *In re OnStar Contract Litig.,* 600 F.Supp.2d 861, 869–70 (E.D.Mich.2009); *Oestreicher v. Alienware Corp.,* 544 F.Supp.2d 964, 969–73 (N.D.Cal.2008) (recognizing safety exception and finding defect was not safety-related), *aff'd* 322 Fed.Appx. 489 (9th Cir. 2009). The Court declines to follow the non-precedential decision in *Larsen v. Nissan N. Am.,* No. A121838, 2009 WL 1766797, at *4 (Cal.Ct.App. June 23, 2009), which rejected in a brief footnote the plaintiffs' belatedly raised argument that their conclusory allegations of

■ Consistent with *Falk* and *Daugherty*, the Court concludes that a safety-based exception exists that might create a duty to disclose a defect even after the period of an express warranty expires[5] and Plaintiff has sufficiently alleged that the defective windshields in the MINIs create an unreasonable safety risk that would be material to a reasonable consumer. Plaintiff alleges that each MINI's windshield is part of the vehicle's safety restraint system and if a MINI with a cracked windshield is in a roll-over accident, the windshield can become dislodged, compromising roof-crush resistance and causing serious head and neck injuries, failure of the passenger side airbag to deploy, or the ejection of passengers from the vehicle.[6] Moreover, replacement windshields are expensive for the average consumer, and Plaintiff adequately alleges that a reasonable consumer would have paid less for a MINI or not bought it at all, if the consumer had known that the windshield was defective.

BMW points out that Plaintiff has not alleged that the defective windshields have actually caused injuries in any rollover accidents, relying on *Tietsworth v. Sears, Roebuck & Co.*, 720 F.Supp.2d 1123, 1133–34 (N.D.Cal.2010). BMW further speculates that injuries would not occur unless an owner makes a conscious decision to drive a MINI with a cracked windshield and then gets into a rollover accident.

The Court is not persuaded by *Tietsworth* or BMW's arguments that Plaintiff must plead that consumers have been injured by the alleged unreasonable safety risk. *Tietsworth* approached the safety defect issue in terms of actual injury to the named plaintiffs, finding that they "lacked

standing" to pursue their claims based on merely posited injuries. *Id.* Here, Plaintiff has alleged that he was injured by the defective windshields by having to replace the cracked windshield in his MINIs twice; BMW has not argued that he lacks standing to pursue those claims. The alleged unreasonable risk of safety created by compromised windshields during rollover accidents is relevant to the materiality of BMW's omissions, and Plaintiff has alleged a plausible unreasonable safety risk that would have been material to the reasonable consumer. *See, e.g., Marsikian v. Mercedes Benz USA, LLC*, No. CV 08–4876 AHM (JTLx), 2009 WL 8379784, at *6–7, 2009 U.S. Dist. LEXIS 117012, at *16–17 (C.D.Cal. May 4, 2009) (refusing to dismiss CLRA claim based on allegations of a "plausible prospect of a safety problem" in a defective air intake system, as well as the "monetary cost and inconvenience of water damage in the car," which would have been material to a reasonable consumer's decision to buy a car at the prices offered). Taking Plaintiff's allegations as true, he has sufficiently pled a plausible claim that the defect creates unreasonable safety risks.

■ Moreover, Plaintiff has adequately alleged that the defect was within BMW's exclusive knowledge. Plaintiff alleges that, since 2001, BMW has learned about the cracking defect from sources unavailable to the class, such as through prerelease testing data, early consumer complaints to BMW and dealers, testing done in response to complaints, replacement part sales data, aggregate data from BMW dealers, and other internal sources. Despite its awareness, BMW did not dis-

a safety risk created a duty to disclose under the CLRA.

**5.** Although *Falk* was decided before *Clemens*, *Clemens* did not mention or discuss a potential safety exception under the UCL, the only statute at issue in that case, so the Court does

not view *Clemens* as disapproving of *Falk's* analysis of *Daugherty*.

**6.** The Court declines to consider BMW's conclusory argument, raised in a footnote in its opening brief and abandoned in its reply, that Plaintiff should have reported any safety defects to NTHSA.

close the existence and nature of the cracking defect at the time Plaintiff and class members purchased their Minis, forcing Plaintiff and the class to pay for repair and replacement of cracked windshields. These allegations are nearly identical to those in *Falk*, which the court found adequately pled exclusive knowledge. *See Falk*, 496 F.Supp.2d at 1096–97 (finding allegations of "aggregate data from dealers," "pre-release testing data," and customer complaints, all within the defendant's exclusive knowledge, were sufficient).

■ Finally, Plaintiff has adequately alleged that BMW actively concealed the windshield defect.[7] For example, Plaintiff alleges that BMW withheld information about the defect it had learned through internal sources and customer complaints (FAC ¶¶ 38–40), that it replaced defective windshields only for the most vocal customers without disclosing the replacement program to all consumers and concealing the program by calling the replacements "goodwill" adjustments (FAC ¶¶ 61–71), and that it used the "pen test" to determine replacements, even though the test frequently produced false positive results (FAC ¶¶ 48–50). This is more than enough to allege active concealment that would create a duty to disclose. *See Falk*, 496 F.Supp.2d at 1097 (finding that plaintiffs sufficiently pled active concealment by alleging that manufacturer did not notify consumers of defect in light of complaints and replaced defective parts with other defective parts in order to conceal defects); *see also Marsikian*, 2009 WL 8379784, at *6, 2009 U.S. Dist. LEXIS 117012, at *14 (finding sufficient to state a claim for active concealment allegations that internal service bulletins, "goodwill" adjustments

given to the most vocal owners, and temporary fixes concealed the defect from the general customer base).

Thus, the Court finds that Plaintiff has sufficiently alleged a duty to disclose the cracking defect and BMW's motion to dismiss Plaintiff's fraud-based CLRA and UCL claims on this ground is DENIED.

### B. Actual Reliance under the CLRA and UCL

■ For fraud-based claims under the CLRA and UCL, Plaintiff must also plead actual reliance. *See In re Tobacco II Cases*, 46 Cal.4th 298, 326, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009) (fraud claims under UCL); *Buckland v. Threshold Enters.*, 155 Cal.App.4th 798, 810, 66 Cal.Rptr.3d 543 (Ct.App.2007) (CLRA claims "sounding in fraud"). Actual reliance is presumed (or at least inferred) when the omission is material. *Tobacco II*, 46 Cal.4th at 327, 93 Cal.Rptr.3d 559, 207 P.3d 20. As discussed above, Plaintiff has sufficiently alleged that the windshield cracking defect would have been material to a reasonable consumer looking to purchase a MINI. *See Falk*, 496 F.Supp.2d at 1095. Thus, the Court may reasonably infer Plaintiff's and class members' actual reliance on the omission of that material information.

■ BMW nevertheless argues that Plaintiff cannot establish materiality sufficient to establish actual reliance on BMW's omissions because he has not alleged that, "had the omitted information been disclosed, [he] *would have been aware of it* and behaved differently." *Mirkin*, 5 Cal.4th at 1093, 23 Cal.Rptr.2d 101, 858 P.2d 568 (emphasis added). Plaintiff does not allege that, before he bought his MINI, he reviewed any brochure, website, or promotional material that might have contained a disclosure of the cracking de-

---

**7.** Although Plaintiff identifies the "active concealment" theory as creating a duty for BMW to disclose the defect, BMW does not appear to attack the sufficiency of the FAC on this basis.

fect. Plaintiff does not respond to this point in his brief.

Given the alleged importance of the cracking defect, had BMW chosen to disclose it to prospective buyers, presumably Plaintiff, as a member of the buying public, would have become aware of the defect in the course of making his purchasing decision. Nevertheless, the Court agrees with BMW that the FAC is devoid of allegations that Plaintiff would have plausibly been aware of the cracking defect before he purchased his MINI had BMW publicized this information. *See Sanchez v. Wal Mart Stores,* No. 06–CV–2573 JAM–KJM, 2009 WL 2971553, at \*2–3, 2009 U.S. Dist. LEXIS 89057, at \*6–7 (E.D.Cal. Sept. 11, 2009) (finding no materiality because, *inter alia,* plaintiff did not prove she would have been aware of any missing warning that might have been placed on product). The Court GRANTS BMW's motion to dismiss the fraud-based CLRA and UCL claims on this ground, but GRANTS Plaintiff leave to amend his Complaint to satisfy this pleading failure.

### C. UCL "Unlawful" Claim Based Upon Secret Warranty Law

■ Plaintiff alleges an "unlawful" practices claim under the UCL based upon violation of California's Secret Warranty Law, California Civil Code section 1795.90 *et seq.* The Secret Warranty Law regulates "Adjustment Programs," defined as

> any program or policy that expands or extends the consumer's warranty beyond its stated limit or under which a manufacturer offers to pay for all or any part of the cost of repairing, or to reimburse consumers for all or any part of the cost of repairing, any condition that may substantially affect vehicle durability, reliability, or performance, other than service provided under a safety or emission-related recall campaign. "Adjustment program" does not include ad

hoc adjustments made by a manufacturer on a case-by-case basis.

Cal. Civ.Code § 1795.90(d). The Secret Warranty Law requires a manufacturer to, "within 90 days of the adoption of an adjustment program, subject to priority for safety or emission-related recalls, notify by first-class mail all owners or lessees of motor vehicles eligible under the program of the condition giving rise to and the principal terms and conditions of the program." Cal. Civ.Code § 1795.92(a).

BMW argues that the TSB conclusively demonstrates that, instead of instituting a secret warranty for defective windshields, BMW engaged in the type of "ad hoc adjustments made by a manufacturer on a case-by-case basis" permitted by statute. However, that determination cannot possibly be made on a motion to dismiss because it rests on the parties' conflicting interpretations of Plaintiff's allegations. BMW contends that the TSB merely reaffirmed that a stress crack, which can arise in "very isolated circumstances," was covered under the original warranty and any other kind of crack was not. However, Plaintiff sufficiently alleges that BMW violated the Secret Warranty Law by instituting a "clandestine program to secretly pay for the cost of replacing or repairing" cracked windshields for some customers even if the crack was not stress-related and even if the cracks occurred outside of the New Car Warranty for those customers who were the most vocal and persistent, using code names for the repairs like "goodwill" or "policy adjustments." (FAC ¶ 14–15, 67.) Crediting those allegations, Plaintiff has readily stated a claim for a violation of the Secret Warranty Law. *See Marsikian,* 2009 WL 8379784, at \*7, 2009 U.S. Dist. LEXIS 117012, at \*18–19 (finding plaintiff stated Secret Warranty Law violation by alleging that defendant sent out temporary service bulletin that it would provide temporary fixes for a defect

only to the most vocal customers without notifying plaintiffs and other owners). Thus, Plaintiff has stated an "unlawful" practices UCL claim based upon violations of the Secret Warranty Law.[8]

**D. Song–Beverly Act**

 The Song–Beverly Act provides in pertinent part: "Unless disclaimed in the manner prescribed by this chapter, every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable. The retail seller shall have the right of indemnity against the manufacturer in the amount of any liability under this section." Cal. Civ.Code § 1792. In general, the warranty of merchantability ensures that goods are fit " 'for the ordinary purpose for which such goods are used.' " *Mexia v. Rinker Boat Co.*, 174 Cal.App.4th 1297, 1303, 95 Cal.Rptr.3d 285 (Ct.App.2009). While the Song–Beverly Act is similar to the California Commercial Code, the Song–Beverly Act was intended to "provide greater protections and remedies for consumers" than the Commercial Code. *Id.* Thus, "[t]o 'the extent that the [Song–Beverly] Act gives rights to the buyers of consumers goods, it prevails over conflicting provisions of the Uniform Commercial Code.' " *Id.* at 1304, 95 Cal. Rptr.3d 285 (second brackets in original).

BMW moves to dismiss Plaintiff's Song–Beverly Act claim on two grounds: (1) Plaintiff cannot allege vertical privity, which is required for a Song–Beverly Act claim; and (2) if BMW did breach any implied warranty under the Song–Beverly Act, that breach occurred both after any

implied or express warranty expired and after the statute of limitations expired.

1. *Vertical Privity*

 Under the California Commercial Code section 2314, which imposes an implied warranty of merchantability in any sale of goods, vertical privity between a consumer and manufacturer is required. *See Clemens*, 534 F.3d at 1023 (holding that, under section 2314, "a plaintiff asserting breach of warranty claims must stand in vertical contractual privity with the defendant."). However, the Court agrees with Plaintiff and the weight of authority that the plain language of section 1792 of the Song–Beverly Act does not impose a similar vertical privity requirement. *See NVIDIA GPU Litig.*, No. 08–4312 JW, 2009 WL 4020104, at *4 & n. 7 (N.D.Cal. Nov. 19, 2009) (noting split in case law and finding no privity requirement); *Gonzalez v. Drew Indus.*, 750 F.Supp.2d 1061, 1072–73 (C.D.Cal.2007) (finding no privity requirement based on plain language of statute); *Gusse v. Damon Corp.*, 470 F.Supp.2d 1110, 1116 n. 9 (C.D.Cal.2007) (finding that privity requirement "ignores the plain language of the Song–Beverly Act" that all goods sold at retail must be accompanied by the manufacturer's implied warranty); 4 B.E. Witkin, *Summary of California Law* § 98 (10th ed.2005) (explaining that the Song–Beverly Act "eliminates the requirement of privity between the buyer and the manufacturer or distributor, by implying warranties in retail sales of consumer goods unless disclaimed.").[9] The Court DENIES BMW's motion to dismiss Plaintiff's Song–Beverly Act claim on this basis.

---

**8.** Plaintiff also argues that he stated a claim under the "unfair" clause in the UCL. BMW does not attack the FAC on this basis and the Court declines to address the issue.

**9.** The courts that have implied a vertical privity requirement have done so without refer-

ence to the statutory language, which this Court views as dispositive of the matter. *See Tietsworth*, 720 F.Supp.2d at 1141–42; *In re Whirlpool Corp. Front–Loading Washer Prods. Liability Litig.*, 684 F.Supp.2d 942, 956 (N.D.Ohio 2009).

### 2. Breach During Implied Warranty Period

The Song–Beverly Act limits the time period for the duration of the implied warranty of merchantability:

> The duration of the implied warranty of merchantability and where present the implied warranty of fitness shall be coextensive in duration with an express warranty which accompanies the consumer goods, provided the duration of the express warranty is reasonable; but in no event shall such implied warranty have a duration of less than 60 days nor more than one year following the sale of new consumer goods to a retail buyer. Where no duration for an express warranty is stated with respect to consumer goods, or parts thereof, the duration of the implied warranty shall be the maximum period prescribed above.

Cal. Civ.Code § 1791.1(c). Because BMW's express warranty on Plaintiff's MINI extended for longer than one year, the maximum duration of one year applies under section 1791.1.

BMW relies on this provision to argue that Plaintiff's implied warranty claim under the Song–Beverly Act is barred. It claims that the one-year duration for any implied warranty section 1791.1 expired in December 2006, one year after Plaintiff purchased his MINI, even though the cracking defect did not manifest until over three years after his purchase. To rebut this argument, Plaintiff relies on *Mexia v. Rinker Boat Co.*, 174 Cal.App.4th 1297, 1305–06, 95 Cal.Rptr.3d 285 (Ct.App.2009). In *Mexia*, the plaintiff brought a claim for breach of the implied warranty of merchantability under the Song–Beverly Act for a boat he purchased that contained a latent defect causing its engine to corrode. *Id.* at 1301, 95 Cal.Rptr.3d 285. The plaintiff had purchased the boat on April 12, 2003, and the alleged defect arose in July 2005. *Id.* at 1301–02, 95 Cal.Rptr.3d 285.

The plaintiff took it an authorized boat dealer for repairs, but the condition persisted and the plaintiff sued on November 27, 2006, for a violation of the Song–Beverly Act. *Id.* at 1302, 95 Cal.Rptr.3d 285.

Citing the statute, the defendants argued that the plaintiff's latent defect claim expired one year after purchase, even though the defect manifested itself two years after purchase. *Id.* at 1308, 95 Cal. Rptr.3d 285. The court concluded at the demurrer stage that the plaintiff's warranty claim over the alleged latent defect was not barred by the one-year duration provision in the Song–Beverly Act. "The implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale," so "[i]n the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery." *Id.* at 1304–05, 95 Cal.Rptr.3d 285.

The court first rejected the argument because it "ignores the distinction between unmerchantability caused by a latent defect and the subsequent discovery of the defect; the fact that the alleged defect resulted in destructive corrosion two years after the sale of the boat does not necessarily mean that the defect did not exist at the time of the sale." *Id.* While the failure to seek repairs on the boat for two years might suggest it was merchantable at the time of the sale and the corrosion was only a later maintenance issue, the court assumed the plaintiff's allegations that the defect existed during the one-year period after purchase were true. *Id.*

The court then squarely rejected the defendants' primary argument that the duration provision "precludes an action for breach of the implied warranty of merchantability under the Song–Beverly Act when the action is based upon a latent

condition that is not discovered by the consumer and reported to the seller within the duration period." *Id.* at 1308–09, 95 Cal.Rptr.3d 285. The court found no support in the text of the duration provision that would require discovery of a latent defect during the maximum one-year period of the implied warranty, and indeed, importing a discovery requirement "would create a notification deadline that would apply *even if the consumer has not discovered or could not have discovered the breach within the duration period.*" *Id.* at 1310, 95 Cal.Rptr.3d 285 (emphasis in original).

The court reasoned that the defendants' interpretation would provide fewer rights for purchasers than the protections in the Commercial Code, which requires a buyer to notify a seller of a defect within a "reasonable time," but "only after the point the purchaser knew or should have known of the breach." *Id.* (emphasis removed). While the court was sympathetic to the defendants' arguments that this interpretation could very well place a significant "burden and expense on small businesses in defending implied warranty claims years after the sale," it found that was a concern better addressed by the legislature, and not the court. *Id.* at 1311, 95 Cal.Rptr.3d 285.

BMW cites *Hovsepian v. Apple, Inc.*, No. 08–5788 JF (PVT), 2009 WL 2591445, at *6–8 (N.D.Cal. Aug. 21, 2009), to argue that the Court should not follow *Mexia's* analysis. In *Hovsepian,* the plaintiffs brought claims for breach of implied warranty under the California Uniform Commercial Code when their computer screens malfunctioned after the expiration of a one-year express warranty. *Id.* at *1. They had not pled claims under the Song–Beverly Act, and the court addressed *Mexia* in dicta in a footnote. *Id.* at *8 n. 7. The court explained that the "*Mexia* decision appears to be contrary to established California case law with respect to the duration of the implied warranty of merchantability as set forth in § 1791.1 of the Song–Beverly Act." *Id.* (citing *Atkinson v. Elk Corp.*, 142 Cal.App.4th 212, 230, 48 Cal.Rptr.3d 247 (Ct.App.2006)).[10] The court expressed skepticism of *Mexia's* holding because "any component failure could be characterized as having been caused by a latent defect, and thus if *Mexia* were read broadly the time limitation imposed by § 1791.1 would be meaningless." *Id.* Nevertheless, the court distinguished *Mexia* on its facts because, in that case, "the court appeared to discuss latent defects that rendered the product unmerchantable from the outset," whereas in *Hovsepian,* the plaintiffs admitted that their computer screens worked properly for more than a year. *Id.*[11] Other federal district courts have suggested *Mexia's* holding was anomalous, though none has expressly rejected it. *See, e.g., Tietsworth v. Sears, Roebuck & Co.*, No. 5:09–CV–288 JF (HRL), 2009 WL 3320486, at *12 (N.D.Cal. Oct. 13, 2009) (calling *Mexia* "something of an outlier," but ruling on different grounds); *Butler v. Sears, Roebuck & Co.*, No. 06 C 7023, 2009 WL

---

**10.** In *Atkinson,* the court concluded that the one-year duration provision in section 1791.1 applied to claims under the federal Magnuson–Moss Warranty Act. 142 Cal.App.4th at 230–31, 48 Cal.Rptr.3d 247. It then found that a defect in roofing shingles arising six years after installation did not support a breach of implied warranty claim because the defect occurred beyond the one-year limit in section 1791.1. *Id.* at 231, 48 Cal.Rptr.3d

247. However, there is no indication that the plaintiff in *Atkinson* alleged that a latent defect existed at the time of installation.

**11.** The Court also cited the unpublished California appellate decision in *Larsen,* which the Court declines to follow both because it is non-precedential and did not cite or discuss *Mexia.*

3713687, at \*3 n. 4 (N.D.Ill. Nov. 4, 2009) (noting decision in *Mexia* and *Hovsepian* without addressing issue).

■■ The Court will follow *Mexia*, rather than *Hovsepian*, to find that Plaintiff can pursue his Song–Beverly Act claim. *Mexia* directly addressed and rejected the precise argument BMW makes here, holding that, so long as a latent defect existed within the one-year period, its subsequent discovery beyond that time did not defeat an implied warranty claim. 174 Cal. App.4th at 1310–11, 95 Cal.Rptr.3d 285. *Hovsepian*, in contrast, only addressed the issue in dicta in a footnote and involved a defect that the plaintiffs had not alleged existed at the time of purchase. The Court must "defer to the California Court of Appeal's interpretation of [a state statute] unless there is convincing evidence that the California Supreme Court would decide the matter differently." *Cal. Pro–Life Council, Inc. v. Getman*, 328 F.3d 1088, 1099 (9th Cir.2003). *Hovsepian* is not "convincing evidence" that *Mexia* would be rejected by the California Supreme Court.

■■ BMW also tries to distinguish *Mexia* on its facts, arguing that the plaintiff in that case alleged a latent defect that existed within the one-year time limit, whereas here, Plaintiff cannot claim that his MINI was not merchantable when he bought it because it provided safe and reliable transportation for over three years. However, Plaintiff has alleged a latent defect in the windshield existed at the time he purchased his MINI, and that the defect eventually caused the windshield to crack over three years after his purchase. As *Mexia* held, the fact that the alleged defect resulted in a cracked windshield three years after the sale of the MINI "does not necessarily mean that the defect did not exist at the time of sale." 174 Cal.App.4th at 1308, 95 Cal.Rptr.3d 285. Plaintiff has therefore adequately alleged a breach of the implied warranty that satisfies the one-year time period of section 1791.1.[12]

■■ BMW argues that Plaintiff's claim is nevertheless barred by the four-year limitations period, which it claims began to run when Plaintiff purchased his MINI in December 2004, but expired in December 2008, long before Plaintiff filed suit in February 2010. California courts have applied the four-year statute of limitations in California Commercial Code section 2725 to Song–Beverly Act claims. *See Mexia*, 174 Cal.App.4th at 1305–06, 95 Cal.Rptr.3d 285. Commercial Code section 2725 states in relevant part:

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued....

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Cal. Comm.Code § 2725(1), (2).

BMW's argument fails because it ignores the existence of the 4–year/50,000–

---

**12.** BMW cites *American Suzuki Motor Corp. v. Superior Court*, 37 Cal.App.4th 1291, 1298, 44 Cal.Rptr.2d 526 (Ct.App.1995) to suggest that Plaintiff's MINI was fit for its ordinary purpose, but that case is distinguishable because few class members in that case had ever experienced any damage due to an alleged design defect in the vehicles at issue; Plaintiff here alleges that he and many class members experienced cracked windshields due to the windshield defect, albeit after the express warranty expired.

mile express warranty, which is a warranty that "explicitly extends to future performance of the goods." That warranty tolled the statute of limitations until Plaintiff reasonably knew that his MINI would not perform as it should, which did not occur until his windshield cracked and BMW would not replace it. *Krieger v. Nick Alexander Imports, Inc.*, 234 Cal. App.3d 205, 215–17, 285 Cal.Rptr. 717 (Ct. App.1991). The statute of limitations for Plaintiff's breach of implied warranty claim thus began running in March 2008, when he first discovered that BMW would not repair his defective windshield. (FAC ¶¶ 21–22.) His complaint, filed only two years later, was therefore timely. Thus, the Court DENIES BMW's motion to dismiss Plaintiff's Song–Beverly Act claim.[13]

## CONCLUSION

BMW's motion to dismiss is DENIED in all respects, except that the Court DISMISSES WITHOUT PREJUDICE Plaintiff's fraud-based UCL and CLRA claims for his failure to plead actual reliance. He is GRANTED LEAVE TO AMEND his complaint to remedy that defect, but any amended complaint must be filed **no later than 20 days from the filing of this Order. Failure to do so will result in dismissal of his fraud-based CLRA and UCL claims WITH PREJUDICE.**

**IT IS SO ORDERED.**

13. As a result, the Court need not address Plaintiff's argument that his second defective windshield nevertheless saves his implied warranty claims by satisfying the one-year duration requirement and the statute of limitations.