**Richard SMITH and Rebecca Klein, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**FORD MOTOR COMPANY, and Does 1–100, inclusive, Defendants.**

**No. C–06–00497 MMC.**

United States District Court, N.D. California.

Sept. 13, 2010.

982

Jeffrey Louis Fazio, Fazio & Micheletti LLP, San Ramon, CA, Dina Elizabeth Micheletti, Fazio & Micheletti LLP, Pleasanton, CA, H. Sinclair Kerr, Jr., Michael Kai Ng, Michael John Von Loewenfeldt, Kerr & Wagstaffe LLP, San Francisco, CA, for Plaintiffs.

Brad W. Petersen, Snell & Wilmer LLP, Phoenix, AZ, John M. Thomas, Byran Cave LLP, St. Louis, MI, Robert J. Gibson, Warren Earl Platt, Snell & Wilmer LLP, Costa Mesa, CA, Timothy A. Devine, Honigman Miller Schwartz & Cohn LLP, Detroit, MI, for Defendants.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MAXINE M. CHESNEY, District Judge.

Before the Court are defendant Ford Motor Company's ("Ford") Motion for Summary Judgment as to Plaintiff Richard Smith ("Smith"), and Motion for Summary Judgment as to Plaintiff Rebecca Klein ("Klein"), each filed November 17, 2008. Plaintiffs have filed a joint opposition to both motions, to which Ford has replied. Having read and considered the papers filed in support of and in opposition to the motions, the Court hereby rules as follows.[1]

### PROCEDURAL AND FACTUAL BACKGROUND [2]

On January 25, 2006 plaintiffs filed the instant action. On September 22, 2006,

---

1. By prior order, the previously scheduled hearing on the motions was vacated.

2. The following facts are either undisputed or read in the light most favorable to plaintiffs.

plaintiffs filed their Third Amended Complaint ("TAC"), in which plaintiffs allege that Ford unlawfully concealed information concerning the failure rate of the ignition locks in its 2000 through 2006 model year Focus vehicles, provided an unconscionable standard warranty, and maintained a secret warranty adjustment program.

An ignition lock is the vehicle part in which the key is inserted and turned to activate the ignition; its purpose is to start the car. When an ignition lock fails, the driver is prevented from turning the key. (*See* Declaration of Dina E. Micheletti ("Micheletti Decl.") Ex. 7 at 31132–33.) According to Ford's internal engineering specifications, its ignition locks are designed to function for at least 80,000 cycles without maintenance.[3] (*See* Declaration of Jeffrey L Fazio ("Fazio Decl.") Ex. C at SNYF 000489; *see also* Micheletti Decl. Ex. A (Deposition of Gerald P. Bonnici ("Bonnici Dep.") at 261:17–23.) Thus, by plaintiffs' calculation "[i]f owners start their Focus 10 times per day, every day, for as long as they own their vehicle, the ignition lock would be cycled 3,650 times a year, thereby taking more than 20 years for an ignition lock to reach 80,000 cycles." (*See* Pls.' Opp'n at 3:19–4:1.)

In the instant litigation, plaintiffs contend the ignition locks in the subject Focus vehicles suffered from two separate but related defects, which plaintiffs characterize as the "ergonomic defect" and the "mechanical defect" (collectively, the "ignition-lock defect"). (*See* Pls.' Opp'n at 5:3–6:2.) As described in a January 21, 2005 email written by Gerald P. Bonnici ("Bonnici"), Ford's "engineer with responsibility for ignition locks in all Ford North American vehicles" (*see* Def.'s Reply at 5:4–5), because of the manner in which the ignition lock is attached to the steering column, the "angle [in which] you put your key in [and]

out of [the] ignition lock is very awkward," requiring "you to bend your wrist back to an 'uncomfortable' position—nearly horizontal instead of the normal 10:00–11:00 position" (the "ergonomic defect"). (*See* Micheletti Decl. Ex. 7 at SNYF 031132–33.) As Bonnici further explains:

> [W]hen you shut off your car, you start rotating back [and] pulling on the key in the "normal" key out position. But because this design requires extra rotation from that "normal" position, customers end up pulling the key out against the tumblers before the lock is ready to release the key. Repeated occurrences of this bend the tumblers[.] [F]inally, bent tumblers prevent [the] lock from turning.

(*See id.*) According to Bonnici, the ignition lock's tumblers' susceptibility to bending presented a "durability issue" (the "mechanical defect"). (*See id.* Ex. 19 at SNYF 00031212, Ex. 23 at SNYF 00021200.)

The Focus was introduced in the United States in 1999 as a 2000 model year vehicle. (*See* Declaration of Gerald P. Bonnici ("Bonnici Decl.") ¶ 14.) In a June, 1999 document, authored prior to the "launch" of the Ford Focus in the United States, Ford engineers reported that inserting the key into the ignition required "high effort." (*See* Micheletti Decl. Ex. 54 at SNYF–00022037.) The 1999 launch of the Focus was "followed by a relatively large number of warranty repairs related to the ignition lock on the 2000 model year Ford Focus and the 2001 model year Focuses built before October 2000," described as the "ignition-lock launch spike." (*See* Bonnici Decl. ¶¶ 15–16.) As of July 31, 2000, ignition locks installed in the 2000 Focus had failed at a rate of 53.89 R/1000 (or 5.4 percent), which Ford characterized as a rate "significantly worse than other car

---

**3.** According to Ford's ignition lock durability test procedures "[o]ne cycle will consist of key insertion, rotation, and key removal." (*See* Fazio Decl. Ex. C at SNY000490.)

lines." (*See* Fazio Decl. Ex. I at SNYF–0002709).

Following the launch spike, in order to counter the high warranty repair rates, Ford and its ignition lock manufacturer made manufacturing and design changes to the subject ignition locks (*see* Bonnici Decl. ¶¶ 16, 18), which resulted in a substantial decrease in the warranty repair rates (*see id.* ¶ 17).[4] Specifically, from a warranty repair rate of 24.3 percent for its 2000 model year Focus vehicles, Ford saw the rate drop to 6.9% for its 2001 model year vehicles, then drop again to 3.1% for its 2002 model year vehicles, before rising to 12% for its 2003 model year vehicles. (*See* Micheletti Decl. Ex. 2.)

Additionally, during the relevant period, Ford operated an "After–Warranty Assistance" ("AWA") program, which is described by Ford as "payments made on a case-by-case basis for repairs not covered by the vehicle warranty, service parts warranty or any Ford [Extended Service Plan], or any non-Ford service contract or aftermarket additive service warranty." (*See* Declaration of Joseph C. Bradley ("Bradley Decl.") Ex. 3 at 2.) The AWA program covered repairs where a Ford vehicle was "not performing to customer expectations and there [was] an opportunity for increased customer satisfaction and owner loyalty." (*See* Bradley Decl. Ex. 3 at 6.) Ford's AWA manual provided a number of questions for dealers to consid-

er when making a decision to offer AWA to a customer. (*See* Bradley Decl. Ex. 3 at 6–7.) Pursuant to the AWA program, Ford replaced 16,227 Focus ignition locks on its model year 2000 through 2006 Ford Focus vehicles, 9655 of which were repaired for 2000 model year Focus vehicles. (*See* Micheletti Decl. Ex. 2 at 2.)[5]

Smith purchased a new 2003 model year Ford Focus from a Ford dealership on October 11, 2003. (*See* Deposition of Richard Smith ("Smith Dep.") Ex. 2.) Smith also purchased Ford's standard New Vehicle Limited Warranty, under which Ford agreed that "authorized Ford Motor Company dealers [would] repair, replace, or adjust all parts on [Smith's] vehicle that [were] defective in factory-supplied materials or workmanship" for "three years or 36,000 miles." (*See* Smith Dep. 20:18–22; *see also* Bradley Decl. ¶ 5, Ex. 1 at 5–6). In November 2005, after Smith had driven his Focus 56,705 miles, Smith's ignition lock failed, preventing him from starting his vehicle. (*See* Smith Dep. Ex. 1 at 89–90). Smith paid $521 to have his ignition lock replaced at a Ford dealership. (*See id.*)

Klein purchased a used 2003 model year Ford Focus from Honda of Oakland in May 2004 (*see* Deposition of Rebecca Klein ("Klein Dep.") Ex. 4) after it previously had been driven for 37,274 miles as a rental car (*see* Klein Dep. 81:22–82:20). Klein bought the vehicle "as-is," with no

---

**4.** The above-referenced manufacturing and design changes were made to ignition locks installed on new Ford Focus vehicles and also to replacement ignition locks for use in warranty repairs and after-market retail sales. (*See* Bonnici Decl. ¶ 19.)

**5.** Plaintiffs also endeavor to show the percentage of after-warranty replacement locks sold to Focus owners relative to the total population of Focus vehicles. In particular, plaintiffs submit a figure for the total number of 2000 through 2006 model year Focus vehicles sold to Ford dealers (*see* Micheletti Decl. Ex.

30) as compared with after-warranty sales figures for ignition locks of the type used in the Ford Focus during the period from 2002 to 2008. (*See id.* Ex. 31; *see also* Fazio Decl. Exs. J, K.) As Ford points out, however, because Ford's Escape model vehicles use the same ignition locks as Ford's Focus model vehicles (*see* Micheletti Decl. Exs. 23, 41), it is not possible, on the evidence available, to determine the number of after-warranty replacement ignition locks that were sold to Focus owners, nor is it possible to compare such sales to the population of Focus vehicles.

warranty. (*See* Klein Dep. 55:1–24, 66:4–13, Exs. 3, 4.) In December 2005, the ignition lock failed and Klein was unable to start her vehicle. (*See* Klein Dep. 47:17–48:5.) A locksmith replaced the ignition lock for $232. (*See* Klein Dep. 47:5–48:5, Ex. 3 at 6.) In September 2006, Klein's ignition lock again failed, and she replaced it for $244. (*See* Klein Dep. 45:9–46:2, Ex. 3 at 1.)

In their TAC Plaintiffs assert state law claims against Ford for (1) Declaratory Relief; (2) Fraudulent Concealment/Nondisclosure; (3) Unjust Enrichment; (4) Unfair and Deceptive Acts and Practices in Violation of the Consumers Legal Remedies Act California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ.Code § 1750 et. seq.; and (5) Unfair, Fraudulent, and Unlawful Practices under the Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code sections 17200–17209. (*See* TAC ¶¶ 79–107.)[6] Ford moves for summary judgment as to each of plaintiffs' claims.

### LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See* Fed.R.Civ.P. 56(c).

The Supreme Court's 1986 "trilogy" of *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), requires

that a party seeking summary judgment show the absence of a genuine issue of material fact. Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (internal quotation and citation omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion." *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (internal quotation and citation omitted).

### DISCUSSION

In its motions for summary judgment Ford argues (1) it had no duty to disclose the risk that the subject ignition locks would fail; (2) it's standard three-year, 36,000 mile warranty is not unconscionable, and (3) Ford did not violate the Secret Warranty Law by not publicizing its AWA program. Additionally, Ford argues Klein lacks standing to bring a CLRA claim, lacks evidence that she suffered any loss as a result of any failure to disclose, and the restitution Klein seeks on her UCL claim constitutes a non-recoverable claim for damages.[7]

---

**6.** Plaintiffs' UCL claim is predicated in part on California's Secret Warranty Law, Cal. Civ.Code § 1795.90–1795.93.

**7.** In some instances, in lieu of reiterating its position in each motion, Ford has incorporated its arguments by reference. (*See* Def.'s

### A. CLRA

#### 1. Duty to Disclose Risk of Ignition Lock Failure

Plaintiffs' claim under the CRLA is based in part on Ford's not having disclosed the risk that ignition locks in its Focus vehicles would fail.[8] (*See* TAC ¶ 98 (citing Cal. Civ.Code § 1770(a)(5), (a)(7)).)

"The CLRA proscribes specified "unfair methods of competition and unfair or deceptive acts or practices' in transactions for the sale or lease of goods to consumers." *Daugherty v. American Honda Motor Co.*, 144 Cal.App.4th 824, 833, 51 Cal. Rptr.3d 118 (2006) (quoting Cal. Civ.Code § 1770(a)). Such acts and practices include "[r]epresenting that goods ... have characteristics ... which they do not have," Cal. Civ.Code § 1770(a)(5), and [r]epresenting that goods ... are of a particular standard, quality, or grade, ... if they are of another," *id.* § 1170(a)(7).

Here, as noted, plaintiffs allege Ford failed to disclose, and was under an obligation to disclose, the risk that the subject ignition locks would fail after the expiration of the warranty period. The California Court of Appeal has held that a manufacturer cannot be found liable under the CLRA for failure to disclose a defect that manifests itself after expiration of the warranty period unless such omission (1) is "contrary to a representation actually made by the defendant" or (2) pertains to a "fact the defendant was obligated to disclose." *See Daugherty*, 144 Cal.App.4th at 835–36, 51 Cal.Rptr.3d 118.

■ Under California law, there are four circumstances in which an obligation to disclose may arise:

(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.

*See LiMandri v. Judkins*, 52 Cal.App.4th 326, 337, 60 Cal.Rptr.2d 539 (1997). As plaintiffs do not allege the existence of a fiduciary relationship or that Ford made any representations about its ignition locks, only the second and third of the above-referenced circumstances are implicated here, and, as set forth above, both require a finding of "materiality." *See, e.g., Oestreicher v. Alienware Corp.*, 544 F.Supp.2d 964, 970–71 (N.D.Cal.2008), (holding "[t]he first condition is not at issue here ... [a]ll of the other situations require materiality"), aff'd *Oestreicher v. Alienware Corp.*, 322 Fed.Appx. 489 (9th Cir.2009).

■ Further, where, as here, a plaintiff's claim is predicated on a manufacturer's failure to inform its customers of a product's likelihood of failing outside the warranty period, the risk posed by such asserted defect cannot be "merely" the cost of the product's repair, *see Daugherty*, 144 Cal.App.4th at 836, 51 Cal.Rptr.3d 118; rather, for the omission to be material, the failure must pose "safety concerns," *see id.* at 835–838, 51 Cal.Rptr.3d 118. In other words, under California law, and as recently described by the Ninth Circuit: "A manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue." *See Oestreicher v. Alienware*

Mot. (Smith) at 2 n. 1; Def's Mot. (Klein) at 9:2–3.)

**8.** As discussed below, plaintiffs' CLRA claim is also based on an allegation that Ford "lim-

it[ed] the warranties applicable to Focus ignition locks in an unconscionable manner." (*See* TAC ¶ 99 (citing Cal. Civ.Code § 1770(a)(19)).)

*Corp.,* 322 Fed.Appx. at 493 (affirming dismissal of CLRA, UCL and fraudulent concealment claims where plaintiff failed to allege defendant had "affirmatively misrepresented its products" or that the alleged defect "posed a threat to his own safety or the safety of others").

Such rule is consistent with the policies underlying California warranty law. As noted in *Daugherty:*

> '[V]irtually all product failures discovered in automobiles after expiration of the warranty can be attributed to a 'latent defect' that existed at the time of sale or during the term of the warranty. All parts will wear out sooner or later and thus have a limited effective life. Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time.... [M]anufacturers ... can always be said to 'know' that many parts will fail after the warranty period has expired. A rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations on warranty coverage.'

*See Daugherty,* 144 Cal.App.4th at 830–31, 51 Cal.Rptr.3d 118 (alterations in original) (quoting *Abraham v. Volkswagen of America, Inc.,* 795 F.2d 238, 250 (2d Cir.1986)). Indeed, as noted by the district court in *Oestreicher,* "the purpose of a warranty is to contractually mark the point in time during the useful life of a product when the risk of paying for repairs shifts from the manufacturer to the consumer." *See Oestreicher,* 544 F.Supp.2d at 972 (citing *Abraham,* 795 F.2d at 250). Further, the rule set forth in *Daugherty* is consistent with the general policy stated by the California Supreme Court that although "[a] consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market," the consumer nevertheless "can ... be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will." *See Seely v. White Motor Co.,* 63 Cal.2d 9, 18, 45 Cal.Rptr. 17, 403 P.2d 145 (1965); *see, e.g., Berenblat v. Apple Inc.,* 2009 WL 2591366, *5–7 (N.D.Cal.2009) (dismissing claims based on allegedly defective computer component; stating "[t]he failure to disclose a defect that might, or might not, shorten the effective life span of [a product] that functions precisely as warranted throughout the terms of the express warranty" is not actionable); *Morgan v. Harmonix Music Systems, Inc.,* 2009 WL 2031765, *4 (N.D.Cal.2009) (dismissing claims based on allegedly defective video game drum pedals; noting that "[a]ccording to all of the relevant case law, defendants are only under a duty to disclose a known defect in a consumer product when there are safety concerns associated with the product's use"); *Wilson v. Hewlett–Packard Co.,* 2009 WL 3021240, *1 (N.D.Cal.2009) (dismissing CLRA claim based on manufacturer's alleged duty to disclose omitted fact where safety concerns not implicated); *Hoey v. Sony Electronics, Inc.,* 515 F.Supp.2d 1099, 1105 (N.D.Cal.2007) (holding "[t]here is no authority that provides that the mere sale of a consumer electronics product in California can create a duty to disclose any defect that may occur during the useful life of the product").

Accordingly, because plaintiffs' CLRA claim is not based on any misrepresentation made by Ford, but rather is based on an allegation that Ford had a duty to disclose the risk its ignition locks would fail, plaintiffs' claim, absent evidence of a safety concern, cannot succeed. *See Daugherty,* 144 Cal.App.4th at 835–838, 51 Cal.Rptr.3d 118.[9]

---

9. Plaintiffs' reliance on cases assertedly hold- ing to the contrary, *see Falk v. General Motors*

### 2. Safety Issue

■ As a threshold matter, Ford argues the Court should follow the reasoning of *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 888 N.E.2d 879, 888 (2008), by finding Ford had no duty to disclose the failure rate of its ignition locks unless plaintiffs have offered evidence Ford violated a "legally required" safety standard. In *Iannacchino*, the Massachusetts Supreme Court held:

> Where, as in this case, there is no allegation that the plaintiffs—or indeed anyone else—have suffered personal injury or property damage, the complaint must identify a legally required standard that vehicles were at least implicitly represented as meeting, but allegedly did not. When the standard that a product allegedly fails to meet is not one legally required by and enforced by the government, a claim of economic injury based on overpayment lacks the premise that the purchase price entitled the plaintiffs to a product that met that standard.

*See Iannacchino* 888 N.E.2d at 888.

As the relevant "legally required" standard, Ford points to the National Highway Traffic Safety Act ("Safety Act"), 49 U.S.C. § 30101, et seq. (*See* Def.'s Smith Mot. at 13:28–14:7.) In response, plaintiffs argue their CLRA claim is not dependent on a violation of the Safety Act because the rule expressed in *Iannacchino* does not reflect California law and because, unlike in *Iannacchino*, the plaintiffs here have suffered property damage. (*See* Pls.' Opp'n at 30:9–31:4.)

The Court declines to follow *Iannacchino*. Ford cites to no case authority, and the Court is aware of none, in which a court, applying California law in deciding whether to impose a duty to disclose a safety-related defect, has required a plaintiff to offer evidence of a violation of a standard legally required by and enforced by the government. *See, e.g., Oestreicher I*, 544 F.Supp.2d at 971 (striking plaintiff's CLRA claim without reference to safety standard); *see also Daugherty*, 144 Cal. App.4th at 836, 51 Cal.Rptr.3d 118 (finding, without reference to Safety Act or other safety standard, "complaint [was] devoid of factual allegations showing any instance of physical injury or any safety concerns").

Accordingly, the Court finds Smith and Klein may demonstrate a duty to disclose without showing the alleged ignition-lock defect violates a standard legally required by and enforced by the government under the Safety Act or other statute or regulation. The Court does, however, find the standards set forth under the Safety Act to be relevant to a determination of whether an alleged defect in an automotive part presents a safety concern.[10]

Here, plaintiffs argue, the subject ignition locks present "safety/security risks" because such locks can (1) prevent drivers from starting their vehicles, and (2) prevent drivers from shutting off their vehicles' engines. (*See* Pls.' Opp'n at 29:17–19.)

---

Corp., 496 F.Supp.2d 1088, 1096 (N.D.Cal. 2007); *Chamberlan v. Ford Motor Co.*, 369 F.Supp.2d 1138, 1145 (N.D.Cal.2005), is unavailing as the defects alleged in those cases were found to raise safety concerns. *See Oestreicher*, 544 F.Supp.2d at 971 (distinguishing *Falk;* noting "safety consideration" presented by defective speedometer was "integral" to district court's finding of materiali-

ty); *Daugherty*, 144 Cal.App.4th at 839 n. 8, 51 Cal.Rptr.3d 118 (distinguishing *Chamberlan* as involving "dangerous manifold defect").

**10.** Indeed, plaintiffs agree the Safety Act "is among the legal standards against which ignition-lock failure may be measured." (*See* Pls.' Opp'n at 31:4–6.)

### a. Inability to Start Vehicle

■ Ford argues "there are no reports that anyone has ever been injured" by the failure of an ignition lock, and that the dangers described by plaintiffs are too speculative to amount to a safety issue giving rise to a duty of disclosure. (*See* Def.'s Mot. (Smith) at 14:13–25.) Ford further argues, by reference to the Safety Act, that "motor vehicle safety" does not include "any conceivable safety hazard, no matter how insignificant" (*see id.* at 14:26–15:4) (citing *United States v. General Motors Corp.*, 656 F.Supp. 1555, 1579 (D.D.C. 1987)), but, rather, means "the performance of motor vehicles in such a manner that the public is protected against unreasonable risk of accidents" (*see id.* at 14:27–15:1) (citing 49 U.S.C. § 30102(a)(8)) (internal quotation omitted).[11] Additionally, Ford argues, the National Highway Transportation Safety Authority ("NHTSA"), which sets and enforces safety performance standards for motor vehicles and motor vehicle equipment, has denied petitions for defect investigations where the alleged defect theoretically could create a safety problem but the risk is small, and, in particular, "has consistently denied defect petitions under circumstances where the risk of not being able to start the vehicle was accompanied by other, even more serious risks." (*See id.* at 15) (citing NHTSA denials of defect petitions).[12]

In response, plaintiffs argue that "being unexpectedly stranded" raises safety concerns sufficient to require disclosure. Plaintiffs point, for example, to a complaint by a diabetic who reported that when her ignition lock failed, preventing her from starting the vehicle, she was "not able to get to her medicine." (*See* Fazio Decl. Ex. H at 27.) Plaintiffs also point to what appears to be an in-house document, titled "Launch & Brand Plan," in which Ford listed its "battery saver technology" and "fail-safe coolant" under the heading "safety/security." (*See* Fazio Decl. Ex. S at 45, 47.) "Security" concerns, however, are distinguishable from "safety" concerns and, in any event, a marketing plan for batteries is not, contrary to plaintiffs' argument, a concession that the defect at issue herein requires disclosure. Lastly, relying on cases decided under the Safety Act, plaintiffs argue that a part that fails in large numbers is more likely to pose a safety concern than a part that fails only on isolated occasions. (*See* Pls.' Opp'n at 31:7–10.)[13] As defendants point out, how-

11. As defined in 49 U.S.C. § 30102, " 'motor vehicle safety' means the performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident, and includes nonoperational safety of a motor vehicle." 49 U.S.C. § 30102(a)(8).

12. *See* Denial of Petition, NHTSA notice, 71 Fed.Reg. 14988 (Mar. 24, 2006) (denying petition where, *inter alia,* "shifter could not be shifted out of the 'Park' position"; stating "petitioner has not provided any evidence of a safety-related defect"); Denial of Petition, NHTSA notice, 67 Fed.Reg. 61375 (Sept. 30, 2002) (denying petition where, malfunction reportedly caused, *inter alia,* "no start"; stat-

ing "the . . . defect alleged in the petition does not appear to be related to motor vehicle safety within the meaning of our statute"); Denial of Petition, NHTSA notice, 66 Fed. Reg. 55243 (Nov. 1, 2001) (denying petition where, *inter alia,* reported defect "caus[ed] engine to stall or fail to start").

13. Plaintiffs also offer evidence that in 1983 Alfa Romeo recalled its GTV6 and Spider models due to an electrical problem that "intermittent[ly]" prevented the vehicles from starting. (*See* Fazio Decl. ¶ 26, Ex. V (stating "inability to start and move the vehicle from the roadway could result in an accident").) The reason for the recall, however, is not reflected in the document submitted, nor is there any evidence that the recall was required under the Safety Act or otherwise.

ever, the cases on which plaintiffs rely concerned a "severe risk of injury while the vehicle was in motion." (*See* Def's Reply at 9:1–19); *see, e.g., United States v. General Motors Corp.*, 561 F.2d 923, 929 (D.C.Cir.1977) (dissenting opinion) (discussing "sudden loss of steering" caused by defective steering system); *United States v. General Motors Corp.*, 518 F.2d 420, 438 (D.C.Cir.1975) (discussing wheel failures).

Having considered the parties' respective evidentiary showings and the applicable law, the Court agrees with Ford that the dangers envisioned by plaintiffs are speculative in nature, deriving in each instance from the particular location at which the driver initially has parked the vehicle and/or the driver's individual circumstances. Plaintiffs offer no evidence that the ignition-lock defect causes engines to shut off unexpectedly or causes individuals to stop their vehicles under dangerous conditions. Nor do plaintiffs offer any legal authority for their argument that a failure to start a vehicle poses a safety concern requiring disclosure. Moreover, to impose such a duty based on risks of the nature cited by plaintiffs, would effectively require auto manufacturers to disclose the failure rate of every part that potentially could immobilize a vehicle. In the absence of authority to such effect, the Court declines to do so.

Accordingly, the Court finds plaintiffs have not offered evidence sufficient to support a finding that the failure to start resulting from the ignition-lock defect presents a risk to safety such that the nondisclosure of such defect constitutes a material omission.

### b. Inability to Shut off Engine

■ Plaintiffs also assert that the ignition-lock defect can prevent the engine from being turned off. Ford argues to the contrary. In support thereof, Ford submits the affidavit of Paul Taylor, Ph.D. ("Dr. Taylor"), an expert in the field of mechanical engineering who specializes in the analysis and prevention of failures and accidents. (*See* Affidavit of Paul Taylor ("Taylor Aff.") ¶ 2. Dr. Taylor describes his evaluation of the subject ignition locks and concludes there are "two separate circumstances where [the subject ignition locks] do not operate correctly ... [and] neither of these conditions will result in a circumstance where ... the engine cannot be turned off." (*See id.* ¶ 5.) [14] As Dr. Taylor further explains, the subject ignition-lock defect cannot result in an inability to turn off the engine because the key cannot become stuck in the "Start" or "Run" positions. (*See id.* ¶¶ 6, 7, 9.) [15] Plaintiffs offer no expert opinion to the contrary.[16]

■ Rather, plaintiffs offer records from Ford's AWS database and Ford's Customer Quality Indicator System ("CQIS") database, which records, plaintiffs argue, are evidence that ignition-lock

---

**14.** Plaintiffs' objection to the above opinion under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590–91, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) is hereby overruled. Contrary to plaintiff's objection, the Court finds Dr. Taylor's opinion to be the "product of reliable principles and methods." *See id.*; (*see also* Taylor Aff. ¶¶ 5–9) (describing procedure by which ignition lock components were placed in clear plastic housing and actions of components were observed when "dislodged and displaced to the limit that geometry al-

lows"; providing detailed diagrams and photographs).

**15.** Further, Dr. Taylor reports, he searched the warranty records in Ford's AWS database, and "[i]n no instance was a warranty record found where the key was jammed" in those positions (*See id.* ¶ 10.)

**16.** Indeed, the TAC contains no allegation to the effect that the ignition-lock failure can result in an inability to shut off the engine.

failures have prevented some Focus drivers from shutting off their engines. (*See* Fazio Decl. ¶ 3; Micheletti Decl. Exs. 25, 26.) Ford objects that such complaints are inadmissible hearsay. (*See* Def.'s Reply at 8 n. 4.) The Court agrees.[17] Plaintiffs make no argument, let alone submit evidence to lay a foundation to show, the customers' complaints, comments by any mechanic, or any other remarks contained therein qualify under any exception to the hearsay rule. Nor is any such exception apparent from the documents themselves. (*See, e.g.,* Micheletti Decl. Ex. A (Bonnici Dep.) at 287:24–288:2) (testifying, in response to question as to source of entry in CQIS database: "I have no idea where this recommendation came from."); *id.* at 304:4–305:22 (testifying in response to question regarding AWS documents shown to him: "I've never seen data in this format."; also testifying AWS database contains complaints irrespective of whether deemed erroneous because "it's just all thrown in there").

Even if the records were admissible, however, the undisputed evidence demonstrates the vast majority of the reports clearly do not reflect an ignition-lock problem, but, rather, an ignition-switch problem, i.e., an electrical problem, which is not the subject of plaintiffs' complaint, and the remaining one or two are more consistent with an electrical problem than an ignition-lock problem. (*See* Micheletti Decl. Ex. A (Bonnici Dep.) at 287–306 (explaining content of each report; distinguishing inabili-

ty to shut off "engine" as opposed to "ignition").) [18]

Accordingly, the Court finds plaintiffs have not offered evidence sufficient to support a finding that the ignition-lock defect results in an inability to shut off the vehicle's engine.

### 3. Replacement Lock Claims

Plaintiffs argue Ford failed to move for summary judgment on plaintiffs "replacement" lock claims and thus is not entitled to summary judgment thereon. (*See* Pls.' Opp'n at 24:8–11.) As discussed above, however, because plaintiffs have offered no evidence of any misrepresentation made by Ford as to the risk of failure of its ignition locks, nor offered evidence sufficient to support a finding that the ignition locks posed a safety concern, Ford was under no duty to disclose the risk that its ignition locks would fail after the expiration of the warranty period. *See Oestreicher II,* 322 Fed.Appx. at 493. Such reasoning applies equally to plaintiffs' replacement lock claims. (See TAC ¶ 85 b. (alleging ignition-lock failure after expiration of limited warranty provided with replacement locks).)

### 4. Conclusion as to CLRA

Because plaintiffs have failed to offer evidence sufficient to support a finding that the ignition-lock defect posed or poses a risk to safety, to the extent plaintiffs' claims under the CLRA are based on Ford's alleged duty to disclose the risk that its original and replacement ignition locks would fail, Ford is entitled to summary judgment.[19]

---

17. Accordingly, Ford's objection to said evidence is hereby sustained.

18. The court also notes that although one might speculate as to how an inability to shut off a vehicle's engine potentially could, in some instances, pose a safety risk, none of the reports suggests the customer encountered any danger, nor do plaintiffs offer any other evidence in that regard. To the extent plaintiffs cite to *St. Phard v. Ira Olds Toyota Co., Inc.,* 1997 WL 1366845, *1–2 (Mass.Su-

per.1997) in an effort to make such a showing, plaintiffs' reliance is misplaced; the vehicle in that case had smoke "com[ing] through the dashboard" *before* the owner unsuccessfully tried to turn off the engine. *See id.*

19. As discussed below, to the extent plaintiffs' claims under the CLRA are based on an allegation that Ford's standard warranty is unconscionable, such claims likewise fail.

## B. Fraudulent Concealment

 "The elements of an action for fraud and deceit based on concealment are (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *See Hahn v. Mirda,* 147 Cal.App.4th 740, 748, 54 Cal.Rptr.3d 527 (2007).

Here, because Ford, as discussed above, owed plaintiffs no duty to disclose the risk that its ignition locks would fail, Ford is entitled to summary judgment on plaintiffs' fraudulent concealment claim. *See Oestreicher II,* 322 Fed.Appx. at 493 (holding, because plaintiff had not alleged defendant made a misrepresentation or that the alleged defect posed a safety risk, the "district court ... properly dismissed [plaintiff's] ... fraudulent concealment claim").

Accordingly, to the extent plaintiffs' *fraudulent concealment claim* is based on Ford's alleged duty to disclose the risk of failure of the subject ignition locks, Ford is entitled to summary judgment.[20]

## C. Ford's Standard Warranty

 Ford argues it is entitled to summary judgment because its standard three-year, 36,000 mile warranty is not unconscionable. Smith contends Ford's warranty, as applied to the ignition lock, is unconscionable because the warranty is presented in the form of a nonnegotiable contract and contains a durational limitation that Ford enforces with respect to a known, latent defect. (*See* Pls.' Opp'n at 46:18–21.)[21]

 "Unconscionability is ultimately a question of law for the court." *See Am. Software v. Ali,* 46 Cal.App.4th 1386, 1391, 54 Cal.Rptr.2d 477 (1996). "Unconscionability has both a procedural and a substantive element." *See Aron v. U–Haul Co. of California,* 143 Cal.App.4th 796, 808, 49 Cal.Rptr.3d 555 (2006). "*Both* elements must be present for a court to invalidate a contract or clause[.]" *Id.* (emphasis added). "The procedural element of unconscionability focuses on two factors: oppression and surprise." *Id.* at 808, 49 Cal.Rptr.3d 555. "Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice." *Id.* (internal quotation and citation omitted). "Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." *Id.* (internal quotation and citation omitted). "The substantive element of unconscionability focuses on the actual terms of the agreement and evaluates whether they create overly harsh or one-sided results that shock the conscience." *See id.* (internal quotations and citations omitted).

Here, Smith fails to offer evidence sufficient to support a finding that the procedural element of unconscionability has been met. In particular, Smith offers no evidence to show he lacked other options for purchasing vehicles from other manu-

---

**20.** As discussed below, to the extent plaintiffs' fraudulent concealment claim is based on an alleged duty to disclose a secret warranty program, such claim likewise fails.

**21.** As noted above, Klein purchased her Focus vehicle "as-is" from a third party. (*See* Klein Dep. 55:19–21.)

facturers or for obtaining additional warranty protection from Ford. *See Dean Witter Reynolds, Inc. v. Super. Ct.*, 211 Cal. App.3d 758, 768, 259 Cal.Rptr. 789 (1989) (finding "claim of oppression may be defeated if the complaining party had reasonably available alternative sources of supply from which to obtain the desired goods . . . free of the terms claimed to be unconscionable"). Indeed, Smith acknowledges extended warranty options were available from Ford and that he chose not to purchase any such extended warranty. (*See* Smith Dep. at 20:15–21:18, 51:14–52:18); *see also Berenblat v. Apple, Inc.*, 2010 WL 1460297, *4–5 (N.D.Cal.2010) (holding, on motion to dismiss, plaintiffs failed to allege "oppression" where, despite non-negotiability of warranty terms, plaintiffs did not allege "they lacked other options for purchasing laptop computers or for obtaining additional warranty protections from [defendant] itself"). Nor does Smith offer any evidence to show he was "surprised" by the terms of Ford's standard warranty. To the contrary, Smith admits he was aware of the durational limits at the time he purchased the warranty. (*See* Smith Dep. 20:15–21:3); *see also Aron*, 143 Cal. App.4th at 809, 49 Cal.Rptr.3d 555 (finding plaintiff failed to plead claim based on procedural unconscionability where only "surprise" allegedly "arose from his discovery that the fuel gauge was an imprecise means of measurement" and "actual obligations imposed on him by the contract were clear").

■ Smith likewise fails to offer evidence sufficient to support a finding in his favor as to the substantive element of unconscionability. Relying on *Carlson v. General Motors Corp.*, 883 F.2d 287 (4th Cir.1989), Smith argues the durational limitation in his warranty is unconscionable because Ford knew of a latent defect at the time of sale. *Carlson*, however, was not based on California law, and concerned claims based on an implied, rather than express, warranty. *See id.* at 290. Moreover, *Carlson*, was decided on a motion to dismiss, not a motion for summary judgment, and, consequently, the Fourth Circuit held, it was premature to resolve the issue of unconscionability without allowing the parties to "present evidence of the circumstances surrounding the original consummation of their contractual relationship," including the existence of meaningful alternatives. *See Carlson*, 883 F.2d at 292–93 (observing, "unconscionability generally . . . include[s] an absence of meaningful choice") (internal quotation and citation omitted) (alteration in original). As discussed, plaintiffs have submitted no evidence to support a finding that Smith lack a reasonable alternative, or any other evidence to support a finding of procedural unconscionability. *See Aron*, 143 Cal. App.4th at 808, 49 Cal.Rptr.3d 555 (holding claim of unconscionability requires showing of both procedural and substantive elements).

Similarly, Smith's reliance on *Maniscalco v. Brother Int'l Corp.*, 627 F.Supp.2d 494 (D.N.J.2009) and *Bussian v. Daimler-Chrysler Corp.*, 411 F.Supp.2d 614 (M.D.N.C.2006), is unavailing. Again, both cases were decided on motions to dismiss, neither case was decided under California law, and to the extent either such opinion is inconsistent therewith, *see, e.g., Daugherty*, 144 Cal.App.4th at 830–31, 51 Cal. Rptr.3d 118, has no bearing on the Court's analysis herein. Lastly, *Bussian* is distinguishable for the additional reason that the plaintiffs therein had alleged a lack of meaningful choice due to a lack of warranty competition. *See Bussian*, 411 F.Supp.2d at 622.

Accordingly, to the extent plaintiffs' CLRA and other claims are based on the asserted unconscionability of Ford's standard warranty, Ford is entitled to summary judgment.

## D. Secret Warranty Law

██ Under California's Secret Warranty Law: "[a] manufacturer shall, within 90 days of the adoption of an adjustment program, subject to priority for safety or emission-related recalls, notify by first-class mail all owners or lessees of motor vehicles eligible under the program of the condition giving rise to and the principal terms and conditions of the program." *See* Cal. Civ.Code § 1795.92(a). "Adjustment program" is defined as follows:

> "Adjustment program" means any program or policy that expands or extends the consumer's warranty beyond its stated limit or under which a manufacturer offers to pay for all or any part of the cost of repairing, or to reimburse consumers for all or any part of the cost of repairing, any condition that may substantially affect vehicle durability, reliability, or performance, other than service provided under a safety or emission-related recall campaign. "Adjustment program" does not include ad hoc adjustments made by a manufacturer on a case-by-case basis.

*See* Cal. Civ.Code § 1790(d).

Here, plaintiffs allege that Ford's After-Warranty Assistance("AWA") was an "adjustment program" as defined under California's Secret Warranty Law (*see* TAC ¶¶ 87, 91, 105(a)); *see also,* Cal. Civ.Code § 1795.90 et seq., and, consequently, that Ford had a duty to disclose such program to owners and lessees of its vehicles. Ford moves for summary judgment, arguing AWA is not an "adjustment program" as defined under the Secret Warranty Law, but rather falls within the statute's exception for "ad hoc" adjustments. *See* Cal. Civ.Code § 1795.90(d).

In *Morris v. BMW of North America, LLC,* 2007 WL 3342612 (N.D.Cal.2007) the court found plaintiffs had adequately pleaded a violation of the Secret Warranty Law where BMW was alleged to have failed to disclose its "plan to reimburse purchasers of 3 Series automobiles for replacement tires." *See Morris,* 2007 WL 3342612 at *2. By contrast, in *Cirulli v. Hyundai Motor Co.,* 2009 WL 5788762 (C.D.Cal.2009), the complaint therein was found insufficient to plead an adjustment program where the plaintiff alleged the defendant "reflexively denied warranty claims for [some] repairs as untimely, while quietly paying for repairs for the most vocal [c]lass members on a case-by-case basis," and that defendant "repaired or replaced certain customers' sub-frames free of charge due to corrosion outside the warranty period, purportedly as a gesture of 'goodwill.'" *See Cirulli,* 2009 WL 5788762 at *6 (emphasis in original omitted) (further holding "paying for repairs for the most vocal [c]lass members" while "reflexively" denying claims for others is not, without more, a violation of the Secret Warranty Law).

Here, plaintiffs argue that an "ad hoc" or "case-by-case" adjustments must be "standard less" and that the questions contained in Ford's materials describing the AWA constitute "eligibility requirements"; thus, plaintiffs conclude, the AWA provides for "more than ad hoc judgments." (*See* Pls.' Opp'n at 50:6–9; *see also* Bradley Decl. Ex. 3 (Warranty & Policy Manual) at 6 (suggesting questions for dealers to consider before offering "after-warranty assistance").) Plaintiffs further point to Ford's replacement thereunder of a large number of locks as further support for their argument that AWA adjustments are not "ad hoc" or "case-by-case." (*See* Pls.' Opp'n at 50:9–10 (noting Ford replaced more than 16,000 Focus ignition locks in its 2000–2006 model years Focus vehicles).) The Court finds plaintiffs' arguments unpersuasive.

First, as Ford points out, the documents on which plaintiffs rely show AWA applies

generally to all customers who incur after-warranty repair costs, and that the adjustments are not specific to customers with ignition-lock problems. In *Morris,* by contrast, BMW had adopted a plan specifically to reimburse "purchasers of 3 Series automobiles for replacement tires." *See Morris,* 2007 WL 3342612 at *2. Ford's AWA thus is distinguishable from the program addressed in *Morris* and, instead, is analogous to the adjustments before the court in *Cirulli,* in that it expressly requires dealers to make decisions on a "case-by-case" basis, upon consideration of the circumstances pertaining at the time the customer makes a complaint. *See Cirulli,* 2009 WL 5788762 at *6; Bradley Decl. Ex. 3 at 6 (providing "[AWA] is a payment made on a case-by-case basis.... AWA *may* be offered when a [Ford] vehicle is not performing to customer expectation and there is an opportunity for increased customer satisfaction and owner loyalty"; further providing "AWA decisions should be made on a case-by-case basis considering all factors, including past loyalty and the likelihood of favorably influencing the customer's satisfaction and future sales and service intentions") (emphasis added).

Moreover, plaintiff's contention that an "ad hoc" decision must be "standard less" is unsupported by any citation to case or statutory authority. As defined by Black's Law dictionary, "ad hoc" means "[f]ormed for a particular purpose." *See Blacks Law Dictionary* 46 (9th ed.2009). Nothing in Ford's AWA materials is inconsistent with this definition. (*See* Bradley Decl. Ex. 3 at 6–7 (suggesting matters for consideration that may "help" with determination as to whether customer "may or may not deserve an AWA," such as: (1) "Has this person been a long-time customer?"; (2) "Has the vehicle been properly maintained?"; (3) "Does the customer like his/her vehicle aside from the present concern?"; (4) "Was this an especially upset customer?"; (5) "Do you believe AWA

would favorably influence this customer's future new car purchase decision?").)

Accordingly, because plaintiffs have failed to offer evidence sufficient to support a finding that Ford's AWA is an "adjustment program," to the extent plaintiffs' claims are based on an alleged violation of the Secret Warranty Law, Ford is entitled to summary judgment.

### E. UCL

Plaintiffs allege Ford violated California's Unfair Competition Law by engaging in the conduct on which plaintiffs' other causes of action are based. The UCL prohibits business acts or practices that are (1) fraudulent, (2) unfair, or (3) unlawful. *See* Cal. Bus. & Prof.Code § 17200; *see also Daugherty,* 144 Cal.App.4th at 837–839, 51 Cal.Rptr.3d 118 (describing "three prongs" of UCL).

#### 1. Fraudulent Conduct

 In order to state a claim under the UCL for fraudulent business practices, a plaintiff must show that "members of the public are likely to be deceived" by the practices alleged. *See Bardin v. Daimlerchrysler Corp.,* 136 Cal.App.4th 1255, 1261, 39 Cal.Rptr.3d 634 (2006). As applicable to plaintiffs' UCL claims in the instant action, the Court finds the reasoning of the California Court of Appeal in *Daugherty* to be persuasive and dispositive:

We cannot agree that a failure to disclose a fact one has no affirmative duty to disclose is likely to deceive anyone within the meaning of the UCL .... [I]n order to be deceived, members of the public must have had an expectation or an assumption about the matter in question .... The only expectation buyers could have had about the [defective] engine was that it would function properly for the length of Honda's express warranty, and it did. Honda did nothing that was likely to deceive the gener-

al public by failing to disclose that [the] engine might, in the fullness of time, eventually dislodge the front balancer shaft oil seal and cause an oil leak.

*See Daugherty,* 144 Cal.App.4th at 838, 51 Cal.Rptr.3d 118.

Here, as discussed above, plaintiffs have failed to show an affirmative duty to disclose the risk of post-warranty failure of the ignition locks; consequently, plaintiffs have not shown that a reasonable customer could have been deceived, because, as a matter of law, the only expectation customers could have had about the subject ignition locks was that they would function for the length of Ford's express warranty. Further, as discussed above, plaintiffs have not shown Ford was required to publicize its AWA.

### 2. Unfair Conduct

■ Similarly, to the extent plaintiffs' UCL claim is brought under the "unfair prong," such claim is unavailing because, as stated in *Daugherty,* "the failure to disclose a defect that might, or might not, shorten the effective life span of an automobile part that functions precisely as warranted throughout the term of its express warranty cannot be characterized as causing a substantial injury to consumers, and accordingly does not constitute an unfair practice under the UCL." *See id.* at 839, 51 Cal.Rptr.3d 118. Likewise, plaintiff's failure to show Ford's AWA constituted a secret warranty precludes plaintiffs' claim that any lack of publication thereof constituted an unfair business practice under the UCL.

### 3. Unlawful Conduct

Lastly, as brought under the "unlawful prong" of the UCL, plaintiffs' claim is derivative of plaintiffs' CLRA, fraudulent

concealment, and Secret Warranty Law claims, and, consequently, fails as well.

### 4. Conclusion as to UCL Claims

Accordingly, Ford is entitled to summary judgment on plaintiffs' UCL claims.

### F. Unjust Enrichment

■ Plaintiffs bring a separate cause of action titled Unjust Enrichment. Unjust enrichment, however, "is not a separate cause of action," but, rather, must rely on some other claim that is cognizable. *See Jogani v. Superior Court,* 165 Cal.App.4th 901, 911, 81 Cal.Rptr.3d 503 (2008) ("[U]njust enrichment is not a cause of action[;] [r]ather it is a general principle underlying various doctrines and remedies[.]"); *see also Ib Melchior v. New Line Prods., Inc.* 106 Cal.App.4th 779, 793, 131 Cal.Rptr.2d 347 (2003) ("[T]here is no cause of action in California for unjust enrichment[;] [t]he phrase 'Unjust Enrichment' does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so.") (internal quotation and citation omitted). As described above, Ford is entitled to summary judgment on each of plaintiffs' other claims.

Accordingly, Ford is entitled to summary judgment on plaintiffs' claim for unjust enrichment.[22]

### CONCLUSION

For the reasons stated above:

1. Ford's Motion for Summary Judgment as to plaintiff Richard Smith is hereby GRANTED.

---

**22.** In light of the above rulings, the Court does not address herein Ford's additional arguments in support of summary judgment.

2. Ford's Motion for Summary Judgment as to plaintiff Rebecca Klein is hereby GRANTED.

**IT IS SO ORDERED.**